Dorothy BRENNAN, Plaintiff,

v.

**CITY OF WHITE PLAINS and Timothy Dolph, Defendants.**

**No. 97 Civ. 2709 (RWS).**

United States District Court, S.D. New York.

Oct. 5, 1999.

Beranbaum, Menken, Ben–Asher & Fishel, New York City, John A. Beranbaum, Jonathan Ben–Asher, of counsel, for Plaintiff.

Peterson & Ross, New York City, William M. Billings, of counsel, for Defendant City of White Plains.

Ahmuty, Demers & McManus, Albertson, NY, Janice Berkowitz, of counsel, for Defendant Timothy Dolph.

## OPINION

SWEET, District Judge.

Defendants Timothy Dolph ("Dolph") and the City of White Plains ("White Plains" or "the City") have moved for summary judgment, pursuant to Rule 56, Fed. R.Civ.P., dismissing the complaint of plaintiff Dorothy Brennan ("Brennan"), who has alleged sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), 42 U.S.C. § 1983 ("Section 1983"), and the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* (the "Human Rights Law").

Upon the findings and conclusions set forth below, the motion of Dolph will be granted, and the motion of White Plains will be granted in part, and denied in part.

### The Parties

Brennan has been an employee of White Plains since 1974, and claims gender-based discrimination and/or retaliation from 1981 to the present.

Dolph is the Senior Personnel Assistant of White Plains, and has held that position since December 2, 1991. From December of 1996 until March of 1998, Dolph was formally authorized by the White Plains Common Council to perform the duties of the City's Personnel Officer.

White Plains is a municipality located within the State of New York.

### Prior Proceedings

Brennan commenced this action on April 17, 1997, which was the subject of a prior opinion of this Court, familiarity with which is assumed. *See Brennan v. City of White Plains*, No. 97 WL 756092, 1998 WL 75692 (S.D.N.Y. Feb.20, 1998). After preliminary motion practice an amended complaint was filed on March 11, 1998.

Brennan's amended complaint (the "complaint") contains six causes of action, alleging sexual discrimination and/or retaliation spanning a period of approximately two decades. The complaint asserts, *inter alia*, discrimination (1) in the determination of Brennan's pay grade; (2) in responding to various requests for pay grade reclassifications; (3) in failing to consider Brennan for a Deputy Commissioner position; and (4) in rejecting Brennan's application for an Assistant Budget Director position, and subsequently disqualifying her from competing for a Deputy Budget Director position. Her complaint also asserts that, after complaining in 1995 to her superiors about the discriminatory treatment she was receiving, she was subject to various forms of retaliation. Brennan's first and second causes of action are brought against the City pursuant to Title VII. Her third cause of action is brought against the City pursuant to Section 1983, as is the fourth cause of action brought against Dolph in his individual capacity. Brennan's fifth and sixth causes of action are brought against White Plains and Dolph pursuant to the Human Rights Law. In addition to requesting injunctive relief and compensatory damages, Brennan's prayer for relief also seeks punitive damages in this action.

The instant motions were made after the completion of discovery, and were heard and marked fully submitted on May 19, 1999.

### The Facts

The facts are gleaned from the parties' Rule 56.1 statements, affidavits, and exhibits, and are not in dispute except as noted below. The content of certain oral statements is disputed, but for the instant purposes, Brennan's versions of those statements are accepted.

Brennan was hired by White Plains as a Clerk/Typist in 1974. Her "pay grade" at that time was three, though in the following years she changed positions several times with corresponding pay grade increases. In 1976, Brennan was promoted to a position as Senior Stenographer, with a pay grade of six. In 1979, she was promoted to the position of Assistant to White Plains' Commissioner of the Department of Public Safety. Her pay grade for that position was eleven.

The Department of Public Safety ("Public Safety") is White Plains' largest department, and is responsible for police services, firefighting, and emergency planning. In 1995 its budget was $32 million, which accounted for 40 percent of the City's entire budget. Of the City's 900 authorized positions, 50 percent were assigned to Public Safety. There is no dispute as among the parties that Public Safety is an important and vital department within the City's departmental hierarchy, and that Brennan has executed her position's significant responsibilities with skill and dedication.

The City's Personnel Department is responsible for overseeing personnel matters in the City's fifteen departments. The Personnel Department is headed by the City's Personnel Officer.

In December of 1980, the Commissioner of Public Safety, John Dolce ("Dolce"), recommended that Brennan's pay grade be reallocated[1] from eleven to fifteen. The Personnel Committee ·agreed to "reclassi-

---

1. A "reallocation" of pay grade, also referred to as reclassification, would result in a higher pay grade without a change in job title. In contrast, a promotion would entail a different job and title.

fy" Brennan's position, and therefore upgraded Brennan to grade twelve, but did not increase Brennan's pay grade to the extent requested. According to Brennan, she was subsequently informed by Deputy Commissioner Carmine J. Motto ("Motto") that the City's Personnel Committee did not wish to give Brennan a higher upgrade because she was a "young girl" and could "get married and pregnant." The Personnel Committee later reconsidered Dolce's request, and agreed to raise Brennan's pay grade to level 13. According to Brennan, the Personnel Committee also agreed to upgrade her to level 15 within another two years, but this was not subsequently done.

In July of 1990, Brennan again requested—with the support of Dolce—that her position at Public Safety be upgraded. Her request was denied, however, by Personnel Officer Stephen Kaluczky ("Kaluczky"), who concluded that there was no justification for an upgrade. More specifically, in a memorandum sent to Deputy Director Motto, Kaluczky indicated that neither Brennan's length of service with Public Safety nor Brennan's heavy volume of work constituted bonafide reasons for an upgrade of Brennan's position. Brennan thereafter complained to Motto that she did not believe she had received fair consideration, and Kaluczky reviewed her reallocation request. However, Kaluczky refused to reconsider his earlier decision, and when Brennan complained to Dolce that the denial was discriminatory, Dolce is alleged to have responded that "women are not minorities."

In March of 1991, after learning of the imminent retirement of Deputy Commissioner Motto, Brennan advised Dolce that she was interested in the Deputy Commissioner position. Despite a written request; Brennan was not considered for the position. Brennan asserts that Motto told her that Dolce would never appoint her because she was a woman. Though the parties disagree vigorously concerning Brennan's qualifications for the position, Brennan asserts that she performed some

of the Deputy Commissioner's functions without any change in pay or title from Motto's retirement in December of 1991 until January of 1993, when Motto's position was filled by a male replacement.

According to Dolce, however, it was Brennan's lack of real police experience that disqualified her from serious consideration for the position—experience that Dolce considered vital considering the Deputy Commissioner's responsibilities and the potential that Motto's replacement could be called upon to temporarily occupy Dolce's position in an emergency. In Dolce's view, moreover, Brennan would have "absolutely no credibility with the men" because of her administrative background. White Plains' Police Bureau has approximately 200 police officers, 11 or 12 of whom are female. There are currently no female sergeants or captains. Two of the eight lieutenants are female. Of the 170 personnel in the City's Fire Bureau, none are female.

As described by former Deputy Commissioner Motto, the Deputy Commissioner's important duties consisted of formulating disciplinary rules and conducting disciplinary hearings, resolving and hearing complaints against taxis, overseeing the alarm ordinance, overseeing the weights and measures bureau, and supervising and participating in the issuance of licenses and permits. The parties disagree as to whether Brennan would have been adequately prepared to assume all of Motto's responsibilities.

A White Plains Senior Personnel Analyst since 1991, Defendant Dolph informally assumed the responsibilities of Personnel Officer Kaluczky in late 1994 or early 1995. From December of 1996 until March of 1998, Dolph was officially authorized by the White Plains Common Council to perform the duties of Personnel Officer.

While functioning as Personnel Officer, Dolph was responsible for handling both promotion and grade reallocation requests. In that capacity, Dolph made recommen-

dations concerning reallocations to the Personnel Committee on behalf of the Personnel Department. The Personnel Committee consists of the Personnel Officer, the Mayor or his or her designee, and three members of the City's Common Council. The Counsel, and not the Personnel Officer, ultimately decides whether reallocation shall be denied.

In January of 1994, Brennan took a civil service exam for the position of Assistant Budget Director. Four of the ten applicants to the position passed the exam, and Brennan received the second highest score. However, when the highest scoring applicant removed himself from the eligibility list, and another eligible candidate was removed by Dolph for failure to meet the position's minimum qualifications, the list was determined to be non-mandatory. Brennan was bypassed for the position in favor of a provisional employee who had been appointed in 1991 but failed the examination. This provisional employee, who was reappointed in September of 1994, was a woman of child-bearing age. Brennan later complained to Dolph about not being considered or interviewed for the Assistant Budget Director position, but the decision to reappoint the provisional was made by White Plains' Budget Director Eileen Earl.

In January of 1995, Dolce once again requested that Brennan's position be reallocated to a higher pay grade. In a memorandum directed to Kaluczky, Dolce requested that her position be increased to a pay grade of seventeen. However, while this request should have been promptly forwarded by Kaluczky for investigation and analysis, it was not. Kaluczky, who had been experiencing a problem with excessive absenteeism, began a period of extended sick leave in February of 1995.

City Personnel Assistant Diane Riddick ("Riddick") spoke to Brennan concerning the delay, and forwarded Brennan a position questionnaire to fill out. The completed questionnaire was reviewed by Riddick, who also spoke to Brennan concerning her reallocation request. Dolph reviewed the questionnaire as well, in addition to other information provided by Brennan and Riddick. He then spoke with Brennan, Dolce, and Earl concerning the request.

According to Dolph, Riddick indicated that she believed Brennan to be overstating her level of responsibility for or involvement with a number of activities. During Dolph's interview with Brennan, Dolph asked a number of questions concerning Brennan's level of responsibility within Public Safety.

However, Brennan took umbrage at Dolph's questioning. In response to questions that Brennan believed underestimated her job responsibilities, Brennan informed Dolph of the Personnel Committee's remarks that had been relayed to her back in 1981—that she had been denied a reallocation because she was a "young girl" and could get "married and pregnant." Brennan also told Dolph that she hoped that she would not be denied reallocation once again because of her sex. In a contested statement, Dolph allegedly told Brennan "maybe you should wait until menopause [for the promotion]."

After her conversation with Dolph, Brennan met with Kevin Fish ("Fish"), White Plains' newly-appointed Executive Officer and a member of the Personnel Committee. Brennan told Fish that she believed that she had been discriminated against in the past, and that she hoped to get a fair and objective evaluation of her reclassification request. Fish assured Brennan that he would not countenance discrimination, but added: "But I got to tell when I think of your position I think of a girl sitting at her desk all day chewing gum." Moreover, in a conversation with Dolce concerning the reallocation request, Dolce told Brennan "no man who's a pay grade 15 is going to give you a 17—it's human nature."

However, according to Dolph, his conversations with Brennan and Dolce only

confirmed Riddick's initial opinion that Brennan was overstating her level of responsibility. Dolph has indicated that he considered the same non-discriminatory criteria he had utilized in considering prior requests for reclassification submitted by other city employees. Dolph's claimed reference point was the City's administrative chain, though he also considered the following factors: (1) level of independence in the job; (2) level of responsibility and accountability; (3) level of supervision provided; (4) complexity of job determined by size of department; (5) impact of job performance; (6) quality of work; (7) impact on the City; and (8) the operations of the department. Under Dolph's analysis, Brennan's position was appropriately located at the top of the administrative organizational chart, and was reasonably placed. Dolph also concluded that Brennan's pay grade of thirteen did not provide sufficient compensation as compared to several other titles, but that this was because those titles were either unrepresentative or graded excessively, and that the City's policy was not to increase an applicant's pay grade merely because another employee's pay grade was too high. Dolph asserts that he relied on this method of analysis notwithstanding the fact that Brennan was supported in her request by an influential department head, and that this decision was consistent with earlier reallocation decisions.

According to Brennan, however, information supplied by Dolce informed Dolph that Brennan was doing a "very good job," and indicated that Brennan had a very high level of independence in her job, that she had a substantial amount of responsibility and accountability, and that her job was reasonably complex. Brennan points out that she was responsible for preparing the budget for the City's largest department, dealt with four different collective bargaining agreements, and acted in an "advisory capacity" to the Commissioner. Brennan also claims to have been in charge of the 84 civilian employees of Public Safety, though the parties have disputed this particular issue, and Dolce has indicated that this is not entirely the case.

Brennan has challenged Dolph's mode of analysis, pointing out that Dolph failed to compare Brennan's job responsibilities with higher-paying positions graded 14–17. Brennan also notes that three-quarters of such positions are filled by men. According to Dolph, however, the grade 14–17 positions were not primarily administrative in nature, as is Brennan's, and he relied upon a "generalized assessment" of those positions. In Dolph's view, for example, attorneys, engineers, and other professionals were generally to be accorded a higher pay status than administrative employees, though other factors might favor a different outcome.

In May of 1995, Dolph submitted a recommendation to the Personnel Committee that no reallocation be made with respect to Brennan's position. The Committee voted to deny Brennan's request.

On July 20, 1995, Brennan filed a charge of sex discrimination with the New York State Division of Human Rights ("Division of Human Rights") and the Equal Employment Opportunity Commission ("EEOC").

Brennan has stated that her conditions of employment changed following her filing of the discrimination charge. She claims, among other things, to have been excluded from meetings of a sort she had regularly attended, that she was not allowed to participate in personnel decisions in which she had previously been involved, that she was no longer allowed to work overtime, and that Dolce began to act towards her in an intimidating manner. Brennan recalls several 1997 incidents in which Dolce yelled at her in reference to her claims of discrimination and related issues.

Subsequent to Brennan's 1994 efforts to obtain the Assistant Budget Director position, that position was either reclassified or abolished. A Deputy Budget Director position, however, remained in its stead. An exam was ordered for the position, though

the City ultimately expects that the position will be deemed non-competitive.

When Brennan sought to take this exam in January of 1998, however, she was prevented from doing so. The initial determination of Brennan's disqualification was made by Tony Pena, a Civil Service Assistant, with the input of John Powell, the Commissioner of Finance. According to Dolph, Brennan was disqualified because she was neither a CPA nor an internal auditor. Brennan appealed, pointing out that she had already been conducting internal auditing for Public Safety for more than three years, and presenting a confirming letter from Commissioner Dolce. However, her appeal to Dolph was unsuccessful. The position was ultimately filled by the same woman who had earlier been reappointed to the Assistant Budget Director position.

Finally, Brennan has claimed that Dolph has restricted her access to various items information in the wake of her claims of discrimination, and that he has deliberately delayed or avoided complying with requests for documents submitted pursuant to New York's Freedom of Information Law ("FOIL"), Public Officers Law, art 6, §§ 84 *et seq.* However, these allegations do not appear in her complaint.

### *Discussion*

#### I. *Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Kay-R Elec. Corp. v. Stone & Webster Constr. Co.,* 23 F.3d 55, 56 (2d Cir.1994) (*citing Brady v. Town of Col-*

*chester,* 863 F.2d 205, 210 (2d Cir.1988)). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell v. City Univ. of New York,* 894 F.Supp. 750, 758 (S.D.N.Y. 1995) (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

In addition to the foregoing standards, the Second Circuit has held that additional considerations must be taken into account when deciding whether summary judgment should issue in an employment discrimination action. *See Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994); *see also Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *See Gallo,* 22 F.3d at 1224.

This does not suggest, however, that summary judgment is never appropriate in an employment discrimination action. As the Second Circuit has noted, the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994). Where no evidence exists or only conclusory allegations of discrimination have been offered to suggest that an employer's motives are improper, summary judgment may be appropriate. *See Meiri,* 759 F.2d at 998; *see also Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 (2d Cir.1994). After all, a party seeking to defeat a summary judgment motion cannot rely upon "conclusory allegations or denials," but rather must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins.*

Co. v. Deloach, 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting R.G. Group Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984)). " '[M]ere speculation or conjecture as to the true nature of the facts [cannot] . . . overcome a motion for summary judgment.' " Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir.1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir.1986)). The responding party "must show the existence of a disputed material fact in light of the substantive law." Peer Int'l Corp. v. Luna Records, Inc., 887 F.Supp. 560, 564 (S.D.N.Y.1995).

## II. The Legal Standards Governing Title VII, Section 1983, and Human Rights Law Claims

As the Second Circuit has explained, the "ultimate issue" in any employment discrimination case is "whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason.' " Stratton v. Department for the Aging, 132 F.3d 869, 878 (2d Cir.1997).

Title VII makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The basic framework of discrimination actions under Title VII is well established:

> First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to "articulate some legitimate, non-discriminatory reason for the employee's rejection." . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); see also United States Postal Serv. v. Aikens, 460 U.S. 711, 714–15, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); Meiri, 759 F.2d at 994. While this test does shift the burden of production once a plaintiff has established a prima facie case, the burden of persuasion remains upon the plaintiff at all times. See Burdine, 450 U.S. at 253, 101 S.Ct. 1089.

Title VII also provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful practice by this subchapter. . . ." 42 U.S.C. § 2000e–3(a). As the Second Circuit has noted, "[t]he objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir.1988). To establish a claim for retaliation pursuant to Title VII, a plaintiff need not prove that her discrimination claim was valid in the first instance.

A prima facie case of retaliation under Title VII requires a showing that (1) the employee was engaged in an activity protected under Title VII; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) an employment action disadvantaged the plaintiff; and (4) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. See Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.1995); Malarkey v. Texaco, Inc., 983 F.2d 1204, 1213 (2d Cir. 1993); Burrell, 894 F.Supp. at 760. The requisite causal connection may be established "indirectly by showing that the protected activity was closely followed in time

by the adverse action." *Manoharan*, 842 F.2d at 593 (*citing Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir. 1986)).

If a plaintiff makes such a showing, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. *See Tomka*, 66 F.3d at 1308. If the defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for retaliation. *See Tomka*, 66 F.3d at 1308.

■ Title VII defines protected activities as (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding. *See Gilani v. National Ass'n of Securities Dealers, Inc.*, No. 96 CV 8070, 1997 WL 473383, at *7 (S.D.N.Y. Aug. 19, 1997) (*citing Williams v. Boorstin*, 663 F.2d 109, 115 (D.C.Cir.1980)).

■ Title VII, however, does not provide the only mechanism by which a publicly-employed plaintiff can seek redress of her discrimination grievances. Section 1983 provides, in relevant part:

> Every person who, under color [of law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. This statute furnishes a cause of action for the violation of federal rights created by the Constitution, *see Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), and provides a vehicle through which public sector employees may vindicate their constitutional rights to be free from gender discrimination. Like Title VII claims, Section 1983 claims premised upon equal protection violations ultimately demand proof of purposeful discrimination. *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995).

■ As the Second Circuit explained in *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134 (2d Cir.1993), a plaintiff may simultaneously bring Title VII and Section 1983 claims against a defendant where the latter claims are not themselves premised upon underlying violations of Title VII:

> A plaintiff cannot use Section 1983 to gain perceived advantages not available to a Title VII claimant, but a plaintiff can assert a claim under Section 1983 if some law other than Title VII is the source of the right alleged to have been denied.

*See id.* at 143 (citations omitted); *see Cohen v. Litt*, 906 F.Supp. 957, 962 (S.D.N.Y. 1995). In the present case, as with *Saulpaugh*, 4 F.3d at 143, Brennan's Section 1983 claims are predicated upon underlying equal protection violations, and may therefore be maintained concurrently with her Title VII claims.

■ However, while there are differences of not-insubstantial moment between Section 1983 and Title VII,[2] the basic analysis of disparate treatment is the same under both. *See Sorlucco v. New York City Police Dep't*, 888 F.2d 4, 6 (2d Cir. 1989). As a result, the discussion below applies to both sets of claims unless otherwise indicated. *See Ortega v. New York City Off–Track Betting Corp.*, No. 97 Civ. 7582(KMW), 1999 WL 342353, at *6 n.3 (S.D.N.Y. May 27, 1999); *Gibson v. Jacob K. Javits Convention Ctr.*, No. 95 Civ. 9728(LAP), 1998 WL 132796, at *4 & n. 4 (S.D.N.Y. Mar. 23, 1998); *see also Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 797

---

**2.** For example, while supervisory personnel may be sued in their individual capacities under Section 1983, Title VII does not allow individual defendants with supervisory control over a plaintiff to be held personally liable. *See Tomka*, 66 F.3d at 1313. As a result, Brennan has not asserted a claim against defendant Dolph under Title VII.

(5th Cir.1982). Because the standards governing liability under the Human Rights Law are virtually identical to those applied to Title VII and Section 1983 claims, the discussion below also equally applies to Brennan's state law causes of action. *See Ortega,* 1999 WL 342353, at *3 n. 2; *Gibson,* 1998 WL 132796, at *4 n. 4; *see also Tomka,* 66 F.3d at 1305 n. 4.

### III. *Brennan Has Presented Factual Issues with Respect to Her Discrimination and Retaliation Claims Against White Plains*

#### A. *Disparate Treatment*

In defending the instant motion against White Plains, Brennan has presented sufficient evidence that White Plains failed to promote her or upgrade her position because of her sex.

As explained above, in order to establish a *prima facie* case of unlawful employment discrimination under Title VII, a plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for a position; (3) she was denied the position; and (4) the denial occurred in circumstances giving rise to an inference of discrimination on the basis of membership in the class. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 311–12 (2d Cir. 1997). Establishing a *prima facie* case of discrimination is not an onerous task. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. The burden then shifts to the defendant to articulate legitimate, non-discriminatory reasons for its actions, to which the plaintiff is supposed to respond by proving pretext. To survive summary judgment a plaintiff must ultimately demonstrate that a genuine issue of fact exists as to whether the defendant's proffered reason or explanation for the employment action was merely a pretext, and that the action was instead prompted by an impermissible motive. *See Samuels v. New York State Dep't of Correctional Servs.,* No 94 CIV. 8645(SAS), 1997 WL 253209, at *4 (S.D.N.Y. May 14, 1997). Brennan has met her burden concerning discrimination in the 1995 pay grade reallocation process and in the selection of a replacement Deputy Commissioner of Public Safety.

As to the first and third prongs of the test, there is no controversy. Brennan is a woman. She was denied a pay grade reallocation in 1995. She was denied a promotion to the Deputy Commissioner position in 1991. She applied for and was denied the position of Assistant Budget Director in 1994. She desired to compete for the Deputy Budget Director position in 1998, but was prevented from taking the civil service examination for that position. Insofar as the second prong of the test is concerned, Brennan has also asserted that she was qualified for the Deputy Budget Director and Deputy Commissioner positions, and that reallocation was logical given the responsibilities of her present position and the compensation of other City employees with comparable or lesser responsibilities.

With respect to Brennan's qualifications and the reallocation process, however, disputed issues exist as to her qualifications for an upward reallocation, for a promotion to the Deputy Commissioner position, and for her application for the Deputy Budget Director position. As of 1995, Brennan had worked for Public Safety for more than 20 years, her work was "excellent," and she had an advanced degree. Moreover, Commissioner Dolce consistently recommended Brennan for reclassification. While White Plains and Dolph have contended that Brennan was not qualified for either the Deputy Commissioner position or the Deputy Budget Director position, given her lack of police or internal auditing experience, Brennan has pressed that her assumption of many of Deputy Commissioner Motto's responsibilities and experience with Public Safety's internal auditing indicate that such contentions are either erroneous or pretextual.

Concerning the Deputy Commissioner position, Brennan's job duties are asserted to be parallel to the job duties that

Motto identified as his own when he worked as Deputy Commissioner. Moreover, after Motto retired, Brennan reportedly assumed many of his job duties until a successor was chosen. At a minimum, Brennan's qualifications for the Deputy Commissioner position is therefore a live issue.

As to the fourth prong of the test, Brennan has presented sufficient evidence to satisfy her burden as to the 1995 denial of a pay grade increase and White Plains' failure to consider her for the Deputy Commissioner Position. The alleged statements of Executive Officer Fish, Deputy Commissioner Motto, and Commissioner Dolce, detailed above, are particularly important in this regard, in that they raise questions about the mindset of White Plains officials responsible for making decisions that affected Brennan's career. For example, as the Mayor's representative on the Personnel Committee, Fish no doubt wielded significant power over Brennan's reallocation request. One could reasonably infer from Fish's statement that he was incapable of accurately assessing Brennan's application for a pay grade reallocation because he equated female employees who performed administrative work with low level clerical workers. *See Galdieri–Ambrosini v. National Realty & Dev't Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (evidence of sexual stereotyping may provide proof that employment decision improperly based on gender). While Dolph has testified that at least two members of the Committee also did not look favorably upon the reallocation request, given the significant pay increase that it would necessarily entail, a resolution of this issue would not be appropriate on a motion for summary judgment.

Moreover, while the statement of Deputy Commissioner Motto concerning Commissioner Dolce's unwillingness to consider a woman for Motto's expected vacancy might well signify Motto's sentiments rather than Dolce's, it cannot be overlooked as a possible indicator of the Department's attitude toward female applicants. Dolce himself has testified that, in part, he did not appoint Brennan as Deputy Commissioner because she would have "absolutely no credibility with the men." This is an ambiguous statement at best, and could well have been intended to refer to Brennan's lack of law-enforcement experience, but when viewed in the light most favorable to Brennan it also could be read to indicate an unwillingness to appoint a woman to the position.

Brennan has not offered any comprehensive, statistical analysis concerning White Plains' employment hierarchy, its employment pool, or the distribution of pay grades as between men and women. However, White Plains does appear to have a lower pay scale for administrative jobs than non-administrative jobs. Moreover, women in White Plains' employ largely hold administrative positions graded thirteen or lower, and men the higher paying jobs graded fourteen or higher. While this evidence alone would by no means be sufficient to establish her claims, *see Silver v. City University of New York*, 947 F.2d 1021, 1022 (2d Cir.1991) (plaintiff's statistical data "fatally flawed" where it did not take into account changes in applicant pool), when combined with the other evidence offered in support of her claims sufficient questions are raised about the handling of her 1995 reallocation request to survive a motion for summary judgment.

However, as undisputed portions of the record indicate, both the Assistant Budget Director and the Deputy Budget Director positions were ultimately filled by women, a fact that counters any possible inference of sex discrimination. Brennan's discrimination claims regarding her application to those two positions are therefore insufficient. *See Samuels*, 1997 WL 253209, at *5 (finding that plaintiff could not meet fourth prong of McDonnell Douglas test with regard to claim of racial discrimination, given that two of four discriminatory

promotions complained of were of members of same protected class as plaintiff).

Given the record presently before the Court, Brennan may be able to meet her ultimate burden of showing that defendants' articulated reasons for denying her the 1995 reallocation and the Deputy Commissioner position were a pretext for sex discrimination. *See Stratton*, 132 F.3d at 879. Drawing all evidentiary inferences in her favor, Brennan may well be able to prove disparate treatment on the part of White Plains.

### B. *Brennan Has Presented a Triable Issue with Respect to Retaliation by White Plains*

On July 20, 1995, Brennan filed a charge of sex discrimination with New York's Division of Human Rights and the EEOC, and filed the first complaint in this action in April of 1997. It is therefore undisputed that she engaged in protected activities that were known to the defendants.

However, not every action of an employer, viewed as unfavorable by an employee who has filed a charge of sex discrimination, becomes actionable under the rubric of retaliation. Rather, only those actions that affect a claimant's conditions of employment rise to the level of retaliation. *See Pomilio v. Wachtell Lipton Rosen & Katz*, No. 97 Civ. 2230(MBM), 1999 WL 9843, at *8 (S.D.N.Y. Jan. 11, 1999) ("An 'adverse action,' in other words, is 'one which adversely impacts on the employee, such as a discharge. demotion, or failure to promote.'") (*quoting Penny v. Winthrop-Univ. Hosp.*, 883 F.Supp. 839, 845 (E.D.N.Y.1995)).

Brennan has claimed that Dolce retaliated against her by acting toward her "in an intimidating manner," by yelling at her on one occasion, and by telling her on another occasion that she had "made it miserable here" and "written things in reports ... that [he] said to [her] in intimacy." While verbal abuse might at times be sufficiently severe and chronic to constitute an adverse employment action, such behavior, without more, hardly rises to the level of actionable retaliation. *See Rivera v. Prudential Ins. Co.*, Nos. 95–CV–0829, 95–CV–0830, 1996 WL 637555, at *14 (N.D.N.Y. Oct. 21, 1997) (finding defendant's verbal abuse insufficient to constitute adverse employment action); *c.f. Pomilio*, 1999 WL 9843, at *8 ("[I] have already decided that plaintiff's allegations with respect to any 'sarcastic comments, demeaning comments, insults, threats, and intimidation' do not rise to the level of actionable discrimination. Thus, they did not 'materially' affect the 'terms and conditions' of plaintiff's employment, and do not constitute adverse employment actions.").

Brennan similarly recalls an incident in which Dolce yelled at her in response to a memorandum complaining about an increased workload due to staff cuts. Not only does this incident not constitute an adverse employment action, but is primarily responsive to the content of Brennan's memorandum rather than her discrimination claims.

Brennan has also claimed that she has been excluded from a number of meetings with outside contractors that she previously would have attended, that she has been excluded from several other meetings that she had traditionally attended, that she has been excluded from personnel decisions, and that various positions have been abolished to punish her for her complaints of discrimination. While under certain circumstances an employee's exclusion from matters previously attended will provide sufficient basis for a retaliation claim, Brennan has made an insufficient showing that these actions have affected her working conditions.

On the other hand, Brennan has claimed that her ability to perform overtime work has been terminated in retaliation for her discrimination claims. Brennan also claims that White Plains retaliated against her by denying her an opportunity to

qualify for the Deputy Budget Director, despite the fact that both the appointed employee and the official making the appointment decision were female. If true, such actions would certainly affect her conditions of employment.

However, while Brennan's allegations concerning White Plains' withholding of overtime opportunities presents a question of fact sufficiently contested to preclude a grant of summary judgment in favor of the City, she has failed to carry her burden insofar as the Deputy Budget Director position is concerned. Other than establishing that her efforts to sit for the position civil service were frustrated some time— approximately three years—after she first brought a discrimination claim against the City, Brennan has not provided the Court with any evidence, other than her own self-serving allegations, from which it could be concluded that the City retaliated against Brennan in the handling of the position's vacancy, or in an assessment of the job's minimum qualifications.

## IV. *Summary Judgment Is Granted as to Defendant Dolph*

Defendant Dolph has pressed for dismissal of a Section 1983 claim, which has been brought against him in an individual capacity, primarily on the ground that he is shielded from liability by the doctrine of "qualified immunity." According to Dolph, his actions with respect to Brennan were taken in good faith, and were objectively reasonable.

 Under the doctrine of qualified immunity, state officials performing discretionary functions are shielded from liability for civil damages if their conduct either "did not violate clearly established rights of which a reasonable person would have known," or "it was objectively reasonable to believe that [their] acts did not violate [those] clearly established rights." *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998) (citations omitted); *see Brown v. City of Oneonta,* 106 F.3d 1125, 1130–31 (2d Cir.1997). Underlying this doctrine is

a concern that governmental officials be permitted to perform their jobs without the "constant threat of individual liability resulting from actions taken in compliance with the law of the time." *Poulsen v. City of North Tonawanda,* 811 F.Supp. 884, 898 (S.D.N.Y.1993).

Courts have not precluded invocation of the qualified immunity doctrine in cases where plaintiffs have alleged intentional discrimination in violation of Section 1983. *See Jemmott v. Coughlin,* 85 F.3d 61, 67–68 (2d Cir.1996) (considering defendants' qualified immunity defense to racial harassment claims brought pursuant to Section 1983, but finding that "[e]ach individual defendant's alleged conduct towards Jemmott, if proven, did amount to severe and pervasive" harassment, which therefore violated Jemmott's clearly established rights; noting that defendants accused of violating "what they reasonably should have known is a clearly established right"); *Samuels,* 1997 WL 253209, at \*9 (finding that factual disputes precluded application of doctrine in context of Section 1983 claim for sex discrimination, but not precluding such a defense as a matter of law); *Eagleston v. County of Suffolk,* 790 F.Supp. 416, 421 (E.D.N.Y.1992) (rejecting plaintiff's argument that qualified immunity doctrine does not apply where plaintiff's claim premised upon intentional discrimination, and finding one defendant's behavior to be objectively reasonable under circumstances), *aff'd,* 41 F.3d 865 (2d Cir.1994). However, it is an open question whether Dolph could be protected against liability under such a rationale, given that sex discrimination in the awarding of promotions or in assigning compensation rates has long been prohibited under Federal law. *See Smith v. Lomax,* 45 F.3d 402, 407 (11th Cir.1995) ("We need not engage in a lengthy discussion of the patently obvious illegality of racial discrimination in public employment at the time the appellants voted to replace Smith."); *c.f Vasbinder v. Ambach,* 926 F.2d 1333, 1341 (2d Cir.1991) ("The district court here ruled that the law

was clear at the time of the retaliation against Vasbinder ... that defendants' actions would violate his First Amendment rights. We agree."); *Poulsen,* ·811 F.Supp. at 898 ("Thus, Graves should reasonably have known when Paulsen first filed her complaint alleging sexual harassment that intentionally permitting a hostile environment ... deprived Poulsen of her right to free speech and equal protection under the law.").

■ Dolph asserts that he acted in good faith, that his behavior was objectively reasonable, and that he is therefore insulated from liability. Such a claim is distinct from a claim that it was objectively reasonable for him to believe his actions were legally proper, but was merely mistaken, or that clearly established law at the time did not prohibit the discriminatory conduct alleged by Brennan. As the Supreme Court explained in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19, 102 S.Ct. 2727.

Much ink has been spilled on the subject of qualified immunity, especially where the underlying Constitutional violation itself requires that the defendant be an intentional actor—as is the case with claims of disparate treatment. Indeed, because Dolph's liability under Section 1983 would necessarily be premised upon a finding that Dolph intended to discriminate or retaliate against Brennan, an application of Dolph's own version of qualified immunity doctrine would seem to duplicate the customary Section 1983 inquiry into discriminatory intent, even if couched in "objective" rather than subjective terms. While it is true that qualified immunity doctrine can apply to constitutional violations requiring a demonstration of subjective intent, it is not clear that the doctrine could be stretched to this degree, or that it allows

a generalized "reasonableness" defense to Section 1983 claims. *C.f. Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1594, 140 L.Ed.2d 759 (1998) (rejecting "Justice Scalia's unprecedented proposal to immunize all officials whose conduct is 'objectively valid,' regardless of improper intent").

■ The instant case does not demand a resolution of this issue, however, as Brennan has failed—as against Dolph—to carry the preliminary burden required of plaintiffs in all discrimination cases, and has not established Dolph's "personal involvement" in constitutional deprivations, as is required by Section 1983.

As the record indicates, Brennan's primary claims against Dolph arise out of (1) Brennan's failure to secure the Assistant Budget Director position, and the City's subsequent refusal to allow Brennan to compete for the Deputy Budget Director position, and (2) the 1995 denial of Brennan's request for reclassification. The Court finds these claims against Dolph to be infirm. Brennan has also asserted that Dolph retaliated against her by limiting information provided to her and by resisting her FOIA requests, but the record does not reveal any evidence upon which a valid claim for such retaliation could be premised.

Brennan has failed to carry her burden of establishing a claim for intentional discrimination against Dolph. While Brennan's complaint asserts that she was discriminated against when applying for the Assistant Budget Director position, it is not contested that the position was ultimately filled by a woman of child-bearing age. Furthermore, Brennan has not seriously contested that the ultimate decision to appoint that woman, a provisional employee who had previously failed a civil service exam for the position, was itself made by a woman—Budget Director Earl. Thus, while Brennan has assailed Dolph's handling of the application process, including a decision to drop Brennan from con-

sideration once other candidates withdrew or were dropped from consideration, none of the materials submitted by Brennan concerning that position could ultimately support a finding that Dolph's actions were discriminatory.

As far as the Deputy Budget Director position is concerned, Brennan has also failed to carry the day. It is not seriously disputed that the City's decision to eliminate or reclassify the Assistant Budget Director position was made by Budget Director Earl. Moreover, undisputed portions of the record indicate that the initial decision to disqualify Brennan from taking the exam for that position was made by Civil Service Assistant Pena, with the input of Commissioner of Finance Powell, and not Dolph himself. According to Dolph, Dolph agreed with their determination that Brennan did not meet the minimum qualifications for the position—being a CPA or internal auditor—and denied an appeal by Brennan of her disqualification. While Brennan has offered in reply some evidence suggesting that she had sufficient internal auditing experience at Public Safety, this alone does not establish an issue requiring resolution by the trier of fact. Dolph's reliance on Pena and Powell is not seriously contested, and under the particular facts of this case counters any negative inference that could be drawn from a denial of Brennan's opportunity to compete for the position.

Similarly, while she has made various arguments concerning the influence of the Personnel Officer and Department over Personnel Committee decisions, Brennan cannot contest that the ultimate decision to deny her 1995 reallocation request was made by the Committee, not Dolph. Despite the parties' significant exchanges concerning the criteria that Dolph used to evaluate Brennan' application for a pay increase, the critical denial decision itself came from the Committee. Dolph has stated at length his explanation of his recommendation concerning Brennan's application for reclassification in 1995, including the criteria he considered. The only remark attributable to Dolph with any conceivable discriminatory implication was his comment regarding menopause, which though tactless, unfunny, and remarkably insensitive, is too slender a reed upon which to rest Brennan's entire Section 1983 claim against Dolph.

The record does not reveal any triable issues concerning Dolph's intentional discrimination or retaliation, and Brennan therefore cannot withstand Dolph's motion for summary judgment. Moreover, because Brennan's federal claim against Dolph is premised upon a violation of Section 1983 alone, she is obligated to establish Dolph's "personal involvement" in constitutional deprivations. See K&A Radiologic Tech. Servs., Inc. v. Commissioner of the Dep't of Health, 189 F.3d 273, 278 (2d Cir.1999); Williams v. Smith, 781 F.2d 319, 323 (2d Cir.1986). A plaintiff seeking to recover such damages must assert a " 'tangible connection between the acts of a defendant and the injuries suffered.' " Verrone v. Jacobson, No. 95 CIV. 10495(LAP), 1999 WL 163197, at *2 (S.D.N.Y. Mar. 23, 1999) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986)). As explained above, Dolph was neither responsible for the reappointment of the provisional Assistant Budget Director, nor was he the ultimate decision-maker concerning her pay reallocation request. Thus, to the extent that Dolph was not personally responsible for those employment actions, Brennan could not hold him liable in an individual capacity for those particular deprivations. See Schallop v. New York State Dep't of Law, 20 F.Supp.2d 384, 392 (S.D.N.Y.1998) ("Viewed in the light most favorable to Schallop, the record here establishes only that Berens participated in discussions leading to the decision on Schallop's employment. Without more, this fails to establish personal involvement under section 1983.")

## V. *Brennan Cannot Recover Punitive Damages Against White Plains*

Though Brennan seeks punitive damages in this action, and does not specify from whom or under what theory of recovery such damages are sought, she will not be able to recover such damages against White Plains.

■■■ Punitive damages cannot be recovered under the Human Rights Law against any defendant, *see Thoreson v. Penthouse Int'l, Ltd.,* 80 N.Y.2d 490, 499, 591 N.Y.S.2d 978, 981–82, 606 N.E.2d 1369, 1372–73 (1992), and cannot be recovered from a municipality under either Title VII or Section 1983. *See* 42 U.S.C. § 1981a(b)(1); *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Hollis v. City of Buffalo,* 28 F.Supp.2d 812, 826 (W.D.N.Y.1998); *Lipsman v. New York City Human Resources Admin.,* No. 94 CIV. 4496(LLS), 1995 WL 25914 at *1 (S.D.N.Y. May 11, 1995).

Brennan does not offer any opposition to this proposition, and will not be entitled to recover punitive damages from the City in this action.

### Conclusion

For the reasons stated herein, Dolph's motion for summary judgment is therefore granted, and White Plains' motion for summary judgment is granted in part, and denied in part.

The pretrial order will be filed on October 27, and a pretrial conference held on that day.

It is so ordered.