**Ralph MONTE, Plaintiff,**

v.

**ERNST & YOUNG LLP, Defendant.**

**No. 02CIV.6886(LTS)(GWG).**

United States District Court, S.D. New York.

Aug. 10, 2004.

The Pagan Law Firm, P.C., By William Pagan, Esq., Scott C. Perez, Esq., New York City, for Plaintiff.

Proskauer Rose LLP, By Bettina B. Plevan, Esq., Brad M. Toberowsky, Esq., Avitai Gold, Esq., New York City, for Defendant.

## OPINION AND ORDER

SWAIN, District Judge.

Before the Court in this employment discrimination case is the motion of defendant Ernst & Young LLP ("Defendant" or "E & Y") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant seeks the dismissal of all of Plaintiff's claims and an award of costs and attorneys' fees.

Plaintiff Ralph Monte ("Plaintiff") alleges that Defendant engaged in discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e; the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621; Section 296 of the New York State Executive Law ("NYSHRL"); and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code, Title 8, §§ 8–107—8–131. Plaintiff asserts claims of discrimination based on age and national origin in connection with the denial of a promotion and with the termination of Plaintiff's employment. In addition, Plaintiff claims that Defendant retaliated against him by firing him for complaining about Defendant's allegedly discriminatory employment practices. Plaintiff also asserts a hostile work environment claim and a claim of negligent hiring/retention. The Court has subject matter jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and of his state and local law claims pursuant to 28 U.S.C. § 1367.

The Court has considered thoroughly all of the parties' submissions pertaining to Defendant's motion. For the following reasons, Defendant's motion is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless characterized otherwise. Plaintiff is a male of Puerto Rican and Spanish descent and was born on February 18, 1960. (Compl.¶¶ 22–25.) Defendant Ernst & Young LLP hired Plaintiff on November 28, 1994 as a Senior Manager in its Metropark, New Jersey office. (Def.'s Local Rule 56.1 Statement ("DR56.1") ¶ 2.) Plaintiff was hired to work in the Information Systems Assurance and Advisory Services practice group ("ISAAS"). (Id. ¶ 5.) In October 1998, E & Y consolidated the New York, New Jersey, and Connecticut ISAAS practice groups to form the Metro New

York ISAAS group ("MNY ISAAS"). (*Id.* ¶ 7.) The leader of the MNY ISAAS group, Chris Vandenoever, formed a "Core Team" made up of Senior Managers and Partners, including Plaintiff, each of whom was put in charge of a distinct ISAAS practice area. (*Id.* ¶¶ 8–9.)

In 1999, Plaintiff and three other Senior Managers in the MNY ISAAS group were considered for promotion to Partner. (Monte Dep., Ex. C to Perez Decl., at 45; Gockel Decl. ¶ 5.) Plaintiff claims that he was told by Vandenoever that he was the number-one rated Senior Manager and that he was the leading candidate of the group to be made Partner. (Monte Dep. at 45.) Neither Plaintiff nor any of the other candidates, all of whom were Caucasian, was promoted to Partner because of the poor financial state of the MNY ISAAS group. (Monte Dep. at 39, 45–46, 50; Doherty Decl. ¶ 4.) In December 1999, however, E & Y hired Sean Culbert as a "direct admit" Partner in the MNY ISAAS practice group. (*Id.* ¶ 33.) E & Y hired Culbert to build a systems implementation consulting practice in the MNY ISAAS group. (Doherty Decl. ¶ 7.) Prior to being hired by E & Y, Culbert worked as a consultant on large-scale systems implementation. (*Id.*) Neither Plaintiff nor any other member of the MNY ISAAS group had systems implementation consulting experience of the type Culbert possessed. (*Id.*) Plaintiff was 39 years old when Culbert was admitted as a Partner. (DR56.1 ¶ 39.)

In approximately June of 1999, E & Y removed Vandenoever as the head of the MNY ISAAS group due in part to financial losses sustained by the group under his leadership. (*Id.* ¶ 12.) In approximately July of 1999, E & Y hired Steve Scharkss to replace Vandenoever. (*Id.* ¶ 13.) Scharkss implemented numerous changes, including disbanding the "Core Team," thereby removing all of the Senior Manag-

ers from their practice area leadership roles, and instituting a reduction-in-force to reduce the group's headcount. (*Id.* ¶ 14.) After Scharkss assumed leadership of MNY ISAAS, approximately ten to thirteen individuals were laid off, including three Senior Managers. (Gockel Decl. ¶ 2; Parker Dep., Ex. D to Perez Decl., at 2.) All three Senior Managers who were laid off were Caucasian. (Gockel Decl. ¶ 4.) One of these Senior Managers, Xenia Parker, testified that the majority of employees laid off after Scharkss' arrival were over the age of 40. (Parker Dep. at 10.)

Senior Managers in the MNY ISAAS group were expected to network and sell projects to clients to keep themselves and their staffs busy with billable work. (Doherty Decl. ¶ 6.) Defendant claims that all Senior Managers, including Plaintiff, were expected to have a minimum utilization (the percentage of an individual's total time spent on billable work) of at least 55% during Vandenoever's tenure as the leader of the MNY ISAAS group, and 68% under Scharkss' leadership. (Monte Dep. at 117; Scharkss Dep., Ex. G to Perez Decl., at 172.) Plaintiff claims that, prior to the arrival of Scharkss, the Partners to whom Plaintiff reported informed him that the target utilization rates were not required of him because his roles and responsibilities differed from those of other Senior Managers. (Monte Dep. at 120.) Plaintiff claims that Mr. Johnston, one of the Partners to whom Plaintiff reported prior to Scharkss' arrival, informed Plaintiff that his roles were to be specifically focused on developing the practice, mentoring, hiring and recruiting. (*Id.* at 122.) According to Plaintiff's own calculation, his utilization percentage for fiscal year 2000 was 33.4%. (Monte Dep. at 202.) Plaintiff does not believe that he ever had an annual utilization rate over 55%. (*Id.* at 119.)

Plaintiff asserts that, after Scharkss assumed leadership of the MNY ISAAS

practice group, "there was an unequal disparity on how accounts were allocated" based on the age and national origin of employees within the group. (PR56.1 ¶ 22.) At deposition, Plaintiff identified four individuals, Xenia Parker, Dave Cozzens, Jerry Lockland, and Phil Karp, whom he alleged received less work and were assigned accounts inferior to those assigned to their younger coworkers. (Monte Dep. at 208.) Terri Craig, a former Partner in the MNY ISAAS group, testified at deposition that certain individuals, united by "common threads" of ethnicity, had difficulty "[getting] involved in projects and activities" following Scharkss' arrival at E & Y. (Craig Dep., Ex. F to Perez Decl., at 26.) Craig named four individuals, including Plaintiff, whom she believed had experienced such difficulty. (*Id.* at 30.) Three of these individuals were Hispanic and one was Asian. (*Id.*) Plaintiff alleges that his own workload diminished as a result of the inequitable distribution of accounts under Scharkss' leadership. (PR56.1 ¶ 23.)

Specifically, Plaintiff asserts that Scharkss removed him from two accounts, Bristol–Meyers Squibb and the NYCE A.T.M. project, without offering any explanation. (*Id.* at 25.) Plaintiff also alleges that he was unfairly passed over for appointment as leader of the Metlife Demutualization Project in 2000. (PR56.1 ¶¶ 43–46.) According to Plaintiff, the role of project leader was assigned to a less qualified and less experienced Senior Manager, Keith Andrezewski, despite the fact that Plaintiff informed both Scharkss and another Partner, John Doherty, that he was available to manage the project. (Monte Dep. at 74–78.) Plaintiff asserts that Andrezewski is a white male in his early thirties who, at the time he was assigned to lead the MetLife project, had less than one year of experience at E & Y. (Monte Dep. at 75.)

Terri Craig served as Plaintiff's counselor from approximately the fall of 1999 until the summer of 2000. (PR56.1 ¶ 26; DR56.1 ¶ 23.) Plaintiff claims that, because he had not been assigned to many projects, he took the initiative to create a plan with Ms. Craig to better utilize his abilities and unused time. (Monte Dep. at 88; Craig Dep. at 47.) As a result, Plaintiff became involved in a number of initiatives that Craig believed would help to launch new services in the Metro New York area and would be beneficial to E & Y's long-term financial health. (*Id.* ¶ 35; Craig Dep. at 51.) Craig testified that Scharkss was aware of Plaintiff's involvement with these types of projects, which did not generate many billable hours and thus contributed to Plaintiff's low utilization rate. (Craig Dep. at 50.) According to Plaintiff, Scharkss never communicated any dissatisfaction with his performance in this regard. (Monte Dep. at 397.)

Craig testified that, around January of 2000, she became aware that Scharkss maintained a list of individuals, including Plaintiff, whom he wanted to terminate. (Craig Dep. at 44.) At deposition, Craig was asked whether there were any "recurring themes of ethnic background, gender or compensation" with respect to the individuals on the list. (*Id.* at 45.) She replied that "the majority of them would fall under ... one of those categories." (*Id.*) Craig recalled the names of seven individuals, including Plaintiff, who were on the list and who had eventually been terminated or had "negotiated their way out of the firm." (*Id.* at 46.) Three of these individuals were Hispanic and one was Asian. (*Id.*) Craig also testified that there were Senior Managers who had utilization rates lower than that of Plaintiff who were not considered for termination by Scharkss because they were "being protected by other more senior partners within the Metro

New York area." (*Id.* at 48.) When asked whether there were any "common themes or threads" among the protected Senior Managers, Craig affirmed that they "weren't Hispanic, weren't Asian, and they weren't females." (*Id.* at 49.)

From approximately March until June 2000, the Partners (and one Principal) in the MNY ISAAS group participated in the fiscal year 2000 Senior Manager roundtables during which they discussed and evaluated the Senior Managers in the MNY ISAAS group and ranked them according to their "performance appraisal" rating as well as other factors, including their level of sales, utilization percentage, and their ability to lead and manage their staffs. (Doherty Decl. ¶ 9.) In preparation for the roundtables, Terri Craig prepared Plaintiff's performance appraisal for the period from October 1999 to January 2000. (Craig Dep. at 40–41.) Craig gave Plaintiff a rating of "Effective" in thirteen categories and a rating of "Exceptional" in one category. (Craig Performance Summary, Ex. F to Plevan Decl.) Craig gave Plaintiff a rating of "Improvement Needed" in the categories of "Scheduling/Utilization," "Sales," and "Self–Development." (*Id.*)

Craig testified at deposition that Plaintiff was in the "middle of the pack" of the Senior Managers who were being evaluated and ranked during the roundtables. (Craig Dep. at 57.) However, Craig testified at deposition that she participated in only two roundtable meetings and that she believed there were other meetings that she did not know about. (*Id.* at 59.) Scharkss' testimony and Defendant's supporting documentation indicate that Plaintiff was ranked 12th out of the ·14 Senior Managers in the MNY ISAAS group and was assigned a performance rating of "Marginally Effective" by the Partners. (Scharkss Dep. at 253; Performance Appraisal and Ranking Chart, Ex. K to Plevan Decl.) During the roundtables, .the Partners expressed concerns about Plaintiff's low annual utilization, his substandard level of sales, and the fact that his performance was below that which was expected of a Senior Manager with the same number of ·years of experience as Plaintiff. (Valeri Dep., Ex. J to Perez Decl., at 67; Scharkss Dep. at 226–27; Doherty Decl. ¶ 10.) The Partners also discussed Plaintiff's allegedly poor performance on the New Jersey Housing Finance Mortgage Association project, which had been managed by Plaintiff and had incurred a $100,000 write-off. (Doherty Decl. ¶ 11; Scharkss Performance Summary, Ex. G to Plevan Decl.)

During the roundtables, the MNY ISAAS practice group was deemed to be "top heavy," and the termination of three to five Senior Managers was discussed. (Gockel Decl. ¶ 5.) The MNY ISAAS practice group lost approximately $2.3 million in fiscal year 2000. (Doherty Decl. ¶ 12.) Plaintiff's salary was $200,000 in fiscal year 2000, making him the highest paid Senior Manager in the MNY ISAAS practice group. (Hackett Decl. ¶ 5.) At the end of the roundtables, the Partners prepared a list of the names of employees in the MNY ISAAS group, including Plaintiff, whose termination had been recommended.[1] (Doherty Decl. ¶ 9; Hackett Decl. ¶ 4.)

---

1. Plaintiff asserts that no conclusions were reached regarding termination during the roundtable performance evaluations. Plaintiff's only supporting evidence is Terri Craig's testimony that, during the roundtable process, she had told Plaintiff that "there had been no conclusions whatsoever that the word 'termination' was on the table." (Craig Dep. at 81.)

Craig testified that she only attended the first two roundtable meetings and that she had been excluded from participation in the process after approximately April 2000. Because Plaintiff has provided no evidence to show that Craig had any knowledge of what occurred during the roundtable discussions af-

In approximately July 2000, the MNY ISAAS group was divided into two subspecialty groups: IT Risk and STS (Security Technology Solutions). (DR56.1 ¶ 26.) Steve Scharkss assumed leadership of the STS practice and Steven Hackett assumed leadership of the IT Risk practice, the group to which Plaintiff was assigned. (*Id.* ¶¶ 27, 61.) Hackett was given the list prepared during the roundtables of the names of employees, including Plaintiff, whose termination had been recommended. (Hackett Decl. ¶ 4.)

In early September 2000, Hackett spoke with Mike Wilk, the Managing Partner of the AABS group, about the recommendation to terminate Plaintiff. (*Id.* ¶ 6.) Wilk suggested that Hackett speak with some of the other Partners Plaintiff had worked for in the past, including Dave Milkowsky, Jim Johnston, and Steve Heil. (*Id.* ¶ 7.) Hackett spoke with each of these individuals shortly thereafter. (*Id.*) Hackett also spoke with John Doherty, John Valeri, and Bob Quinn, Partners in the MNY ISAAS group, to obtain their assessment of Plaintiff and to learn whether any of them could provide any compelling reasons not to terminate Plaintiff's employment. (*Id.* ¶ 8.) Hackett asserts that all of the Partners agreed that Monte should be terminated because he did not have enough work to keep himself effectively utilized, he did not have a proven track record in sales to effectively sell new work to keep himself or his staff utilized, and he did not possess the leadership skills to motivate and lead those supervised. (*Id.*)

Sometime in September 2000, Scharkss prepared Plaintiff's year-end performance appraisal for fiscal year 2000. (Scharkss Performance Summary, Ex. G to Plevan Decl.) Scharkss assigned Plaintiff a rating of "Improvement Needed" in thirteen categories, a rating of "Effective" in three categories, and "Exceptional" in one category. (*Id.*) In the narrative portion of the performance appraisal, Scharkss discussed some of the performance deficiencies identified during the roundtables and concluded, "At this point, Ralph should consider other caree[r] opportunities." (*Id.*) On September 14, 2000, Scharkss forwarded by email a copy of the performance appraisal to Maryella Gockel (E & Y's Area Director of Human Resources), John Valeri (a Partner in the MNY ISAAS group), and Steven Hackett. (Scharkss Dep. at 179.) In the cover email attaching the performance appraisal, Scharkss wrote: "I am recommending termination." (Scharkss Email, Ex. H to Plevan Decl.)

Hackett asserted in his declaration that he decided that Plaintiff's employment should be terminated as a result of his discussions with the Partners about Plaintiff, his review of the performance appraisal prepared by Scharkss, and the poor financial state of the MNY ISAAS group. (Hackett Decl. ¶ 12.) On September 15, 2000, Hackett sent an email to Gockel in which he stated that the "consensus of all the partners is that we should not 'save' Ralph [Monte]." [2] (*Id.* ¶ 16; Hackett Email, Ex. A. to Hackett Decl.) Hackett asserts that he and Gockel decided that

---

ter April 2000, Craig's testimony is insufficient to establish a question of fact as to whether a decision was made to recommend Plaintiff's termination during the roundtables.

2. Plaintiff's contests the authenticity of a number of email messages submitted as evidence by Defendant. (Pl.'s Brief at 32.) Plaintiff has offered no evidence, however, to support a finding that Defendant fabricated or

modified the email messages. Defendant has proffered sworn statements attesting to the authenticity of the messages. Moreover, Plaintiff's assertion that "the emails are suspect on the basis of having been preserved for so long" is insufficient to create a question of fact without some supporting evidence to show that preservation of the email was in any way unusual under the circumstances.

Plaintiff should be informed of his termination before Plaintiff received his first paycheck of the year, which would reveal that he had not received a salary increase. (Hackett Decl. ¶ 17.) Hackett left a voicemail for Plaintiff stating that he wanted to meet with him during the week of October 9. (*Id.* ¶ 18.) Plaintiff informed Hackett that he was not available to meet on the dates Hackett suggested, but was available to meet on October 17, 2000. (*Id.*)

On October 13, 2000, Plaintiff received his paycheck, which revealed that he had not received a salary increase for the new fiscal year. (Monte Dep. at 397.) On October 16, 2000, Plaintiff filed a complaint of discrimination against E & Y with the New York State Department of Human Rights alleging discrimination on the basis of age and national origin. (*Id.* at 398.) Later that day, Plaintiff informed Maryella Gockel of the filing of his charge. (*Id.* at 261.) On October 17, 2000, Hackett and Valeri met with Plaintiff to inform him of the decision to terminate his employment. (*Id.* at 404.)

Plaintiff alleges that E & Y failed to follow its own internal policies prior to terminating his employment. (Pl.'s Brief at 22.) Specifically, Plaintiff asserts that the feedback he received regarding the alleged deficiencies in his job performance fell far short of the standard described in the "Performance Feedback and Development" section of the Firm Organization & Administration Manual. (*Id.*) Plaintiff testified at deposition that he had "never been talked to about any deficiencies in [his] work" and had "never received any written or verbal communication that [he] had problems" prior to his termination. (Monte Dep. at 397.) Plaintiff also claims that E & Y did not place him on a performance improvement plan ("PIP"), which he asserts was "normal for people that were being considered as in need of improvement." (*Id.*)

Plaintiff identifies a number of statements and actions by Partners that Plaintiff believes demonstrate discriminatory animus toward himself and other employees at E & Y. Plaintiff alleges that, around 1997–1998, John Doherty approached Plaintiff and specifically asked him his age, making Plaintiff uncomfortable. (Monte Dep. at 220.) Plaintiff claims that Doherty also made a statement in 1999 regarding the inability of an older employee, Phil Karp, to keep up in the work environment because of his age. (*Id.* at 307.) Xenia Parker testified at deposition that her evaluation statement specifically stated that she was too old to become a Partner. (Parker Dep. at 27) Parker testified that Scharkss repeatedly told her that she was "senior" and that she "knew everyone," leading her to believe that Scharkss was implying that she was "too old" and "had to go." (*Id.* at 17.) Parker also testified that, generally, the people that Scharkss hired and liked were under thirty-five, blue-eyed, and blonde. (*Id.* at 21.) Plaintiff alleges that, in approximately 1997, Steve Heil asked him if he was going to continue hiring people with vowels at the end of their names. (Monte Dep. at 222–23.) Plaintiff alleges that, during a meeting in June of 2000, Scharkss made a statement using a vulgarity in Spanish, and turned to Plaintiff and said, "You know what that means, don't you?" (*Id.* at 225) Plaintiff claims that, during a Partner meeting, Scharkss referred to Monte and Frank De La Cruz as "Mexicans." (*Id.* at 230; Parker Dep. at 19.) Plaintiff claims that Scharkss also made fun of Allen Lum, who is of Chinese descent, for speaking with an accent. (Parker Dep. at 18.) Lum testified that Scharkss' behavior in general indicated that Scharkss believed that people of certain descent, including Hispanics, were not as intelligent as Caucasians. (Lum Dep., Ex. E to Perez Decl., at 19.)

*DISCUSSION*

Summary judgment shall be granted in favor of a moving party where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In the summary judgment context, a fact is material "if it might affect the outcome of the suit under the governing law," and an issue of fact is genuine, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir.2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Second Circuit has explained that the "party against whom summary judgment is sought ... 'must do more than simply show that there is some metaphysical doubt as to the material facts ... The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Mere conclusory allegations, speculation or conjecture," however, will not provide a sufficient basis for a non-moving party to resist summary judgment. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir.1996). "Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination." *Turner v. Nat'l R.R. Passenger Corp.*, 181 F.Supp.2d 122, 126 (N.D.N.Y.2002) (citing *Gallo v. Prudential Residential Serv.*, 22 F.3d 1219, 1224 (2d Cir.1994)). The trial court is required to "resolve all ambiguities and draw all reasonable references in the light most favorable to the party opposing the motion." *Cifarelli*, 93 F.3d at 51 (citing *Inst. for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d 414, 418 (2d Cir. 1994)).

*Discrimination Claims Under Title VII. the ADEA, 42 U.S.C. § 1981, NYSHRL, and NYCHRL*

 Employment discrimination cases based on circumstantial evidence, such as this one, are analyzed under the three-step burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[34] In the context of a

---

**3.** The following analysis applies to Plaintiff's claims under Title VII, *see McDonnell Douglas*, 411 U.S. at 802–804, 93 S.Ct. 1817; the ADEA, *see Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir.2000); 42 U.S.C. § 1981, *see Mack v. Port Auth. of N.Y. and N.J.*, 225 F.Supp.2d 376, 385 (S.D.N.Y.2002); the NYSHRL and the NYCHRL, *see Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046–47 (2d Cir.1992).

**4.** Plaintiff argues that his discrimination claims should be analyzed according to the burden-shifting framework set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under *Price Waterhouse*, if a plaintiff in a Title VII or ADEA suit can establish that a prohib-

ited discriminatory factor played a motivating part in the challenged employment decision, the defendant has the burden of proving that it would have made the same decision even if it had not taken the discriminatory factor into account. *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 180 (2d. Cir.1992). To warrant a *Price Waterhouse* burden shift, however, "the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to prove Defendant's discriminatory intent." *Raskin v. Wyatt Co.*, 125 F.3d 55, 61 (2d Cir.1997) (citation omitted). "Stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not justify a burden-shifting analysis. *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J. concurring). Despite Plaintiff's apparent attempt to produce a "smoking gun" by misrepresenting a pair of

motion for summary judgment, Plaintiff must first establish a *prima facie* case of discrimination. *Id.* To establish a *prima facie* case of discrimination, Plaintiff must show that (1) he belongs to a protected class; (2) he suffered adverse employment action; (3) he was performing his duties satisfactorily; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Id.* In employment discrimination cases, the burden of establishing a *prima facie* case is minimal. *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001). Once Plaintiff establishes a *prima facie* case, a presumption that the employer unlawfully discriminated against the employee is raised and the burden shifts to the employer to articulate some legitimate nondiscriminatory reason for the employer's action. *Fischer v. Vassar Coll.,* 114 F.3d 1332, 1335–36 (2d Cir.1997) (en banc), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). An employer sustains its burden "by producing *any evidence* of nondiscriminatory reasons, whether ultimately persuasive or not." *Weeks v. N.Y. State Div. of Parole,* No. 00 CV 5865, 2002 WL 32096593, at *4 (E.D.N.Y. Nov.25, 2002) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (emphasis in original). "The employer need not prove by a preponderance of the evidence that the reasons for his actions were not discriminatory, but may simply 'present clear and specific reasons for the action.'" *Gibbs v. Consol. Edison Co. of N.Y., Inc.,* 714 F.Supp. 85, 89 (S.D.N.Y. 1989) (citation omitted). If the employer meets its burden, the presumption of discrimination raised by Plaintiff's *prima facie* case disappears, and the sole remaining issue is whether Defendant intentionally discriminated against Plaintiff. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

*Failure to Promote*

 Plaintiff has not argued against dismissal of his claim of discriminatory denial of promotion. Defendant is entitled to judgment as a matter of law on this claim because Plaintiff has failed to establish a *prima facie* case of either age or national origin discrimination. With respect to Plaintiff's claim of age discrimination, Plaintiff has offered no evidence to show that he was a member of a protected class, *i.e.,* over 40 years of age, at the time he was denied partnership. It is undisputed that Plaintiff was 39 years old when Defendant made the decision not to promote him to Partner. With respect to Plaintiff's claims of both age and national origin discrimination, Plaintiff has failed to establish the fourth element of his *prima facie* case: that the denial of promotion occurred under circumstances giving rise to an inference of discrimination. It is uncontested that, when Plaintiff was denied promotion, three other Senior Managers, all of whom were Caucasian, were similarly denied promotion because the poor financial state of the MNY ISAAS group could not support the promotion of any Senior Managers to Partner. The fact that Sean Culbert, a Caucasian, was hired as a "direct admit Partner" six months after Plaintiff was denied promotion is insufficient to create an inference of discrimination because Culbert and Plaintiff were not "similarly situated" individuals. *See Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997) (inference of discrimination sufficient to establish a *prima*

alleged statements in his brief (*Compare* Pl.'s Brief at 21 *with* Scharkss Dep. at 226–7, Monte Dep. at 230, Parker Dep. at 19), the

evidence of Defendant's discriminatory intent is insufficiently direct to warrant a *Price Waterhouse* analysis.

*facie* case of discrimination arises where Plaintiff is treated differently than individuals outside his protected class who are "similarly situated in all material respects"). It is uncontested that Culbert was hired from outside the MNY ISAAS group specifically to build a systems implementation consulting practice, an area in which Culbert had particular expertise and significant experience. Plaintiff has offered no evidence to show that he possessed similar skills or experience. Plaintiff's evidence is, therefore, insufficient to raise an inference of discrimination with regard to his denial of partnership. Accordingly, Defendant's motion is granted to the extent that Plaintiff's claim of discriminatory denial of partnership is dismissed.

### Termination

Defendant does not contest that Plaintiff has proffered evidence sufficient to establish a *prima facie* case of age and national origin discrimination with respect to his termination. For purposes of this motion, the Court assumes that Plaintiff has met his initial, minimal burden of establishing his *prima facie* case. Defendant, in turn, has satisfied its burden under *McDonnell Douglas* of articulating legitimate, nondiscriminatory business reasons why Plaintiff's employment was terminated. Defendant claims, in essence, that Plaintiff was terminated because his performance was not at the level expected of an experienced Senior Manager, and because he was the highest paid Senior Manager in a practice group that had lost over $2 million in the previous fiscal year. Defendant asserts that termination was appropriate due to Plaintiff's low utilization rate, his substandard level of sales, and his lack of effective leadership skills.

These nondiscriminatory reasons for Defendant's decision to terminate Plaintiff's employment having been prof-

fered, the burden shifts to Plaintiff to offer evidence that would allow a rational factfinder to conclude that the proffered reasons were merely a pretext for prohibited discrimination. *McGuinness*, 263 F.3d at 54. "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. 2742 (citation omitted) (emphasis in original). Plaintiff does not have to prove that discrimination was the only factor in the adverse employment action, but that it was a "determinative factor." *Schnabel*, 232 F.3d at 91.

Plaintiff's discrimination claims with respect to his termination cannot survive summary judgment because he has failed to present evidence sufficient to allow a rational jury to find that Defendant's stated reasons for terminating his employment were false. Plaintiff's efforts to raise a jury question in this regard focus principally on whether or not his admittedly low utilization percentage was a factor upon which Defendant could have legitimately based the decision to terminate his employment. In this regard, Plaintiff has introduced evidence that, when viewed in the light most favorable to him, would allow a reasonable jury to conclude 1) that Plaintiff was not required to meet utilization targets prior to Scharkss' arrival, 2) that Plaintiff had difficulty achieving a high utilization rate because Scharkss did not assign him accounts that would generate significant billable hours, and 3) that other Senior Managers with utilization rates lower than Plaintiff were not considered for termination as a result of the roundtable performance evaluations. Plaintiff's evidence is sufficient to raise a question of fact with respect to Defendant's reliance on utilization rates as a criterion for assessing Plaintiff's per-

formance. However, Plaintiff has failed to introduce evidence to demonstrate that Defendant's other stated reasons for Plaintiff's termination were false, or to show that utilization percentages were given greater weight as a measure of performance than the other criteria identified by Defendant.

Specifically, Plaintiff has offered no admissible evidence that would allow a reasonable jury to find that his level of sales was not substandard as alleged by Defendant, nor has Plaintiff introduced evidence to rebut Defendant's assertion that a Senior Manager's level of sales was an important factor in assessing individual performance. Plaintiff has not even contested Defendant's assertion that he lacked the leadership skills to effectively lead and motivate those under his supervision. Further, Plaintiff has offered no evidence to rebut Defendant's assertion that Plaintiff's termination was part of a legitimate effort by the Partners to streamline the "top heavy" MNY ISAAS practice group by eliminating three to five Senior Manager positions. It is uncontested that the group lost $2.3 million during fiscal year 2000, and that Plaintiff's salary of $200,000 was the highest of any Senior Manager in the group.

Even if Plaintiff had met his burden of proffering evidence sufficient to allow a rational fact-finder to conclude that Defendant's stated reasons for Plaintiff's termination were false, Defendant would still be entitled to summary judgment since Plaintiff has failed to introduce evidence sufficient to support a rational inference that discrimination was a "determinative factor" in the decision to terminate his employment. The Supreme Court has explained that while it is *"permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," an employer is entitled to judgment as a matter of law if "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves,* 530 U.S. at 147–48, 120 S.Ct. 2097 (emphasis in original). While Plaintiff has introduced some evidence to support an inference that discrimination based on both age and national origin had occurred at E & Y, he has introduced very little evidence to demonstrate that his own age or national origin factored into Defendant's decision to terminate his employment. In contrast, Defendant has proffered a great deal of uncontroverted evidence to show that Plaintiff's termination was the result of a legitimate evaluation process, and that the ultimate decision to fire Plaintiff was made by Steven Hackett, a party to whom Plaintiff has not attributed any discriminatory motives.

Plaintiff's evidence of discrimination consists of a few vague and isolated remarks made by Scharkss and two other Partners over the course of several years, as well as evidence suggesting that Scharkss favored employees who were white and under the age of 40. However, Plaintiff has introduced no evidence, other than his own opinion, to rebut Defendant's evidence demonstrating that the decision to terminate Plaintiff's employment was made by Hackett, who based his decision on a number of factors independent of Scharkss' performance evaluation and the results of the roundtable process. Even if Plaintiff had produced evidence sufficient to allow a jury to find that Scharkss and/or the other Partners wielded such influence over Hackett that the decision was effectively their own, Plaintiff's evidence of stray comments and Scharkss' biases would be insufficient, without more, to demonstrate that discrimination was a determinative factor in the decision. *See Campbell v. Alliance Nat'l Inc.,* 107

F.Supp.2d 234, 247 (S.D.N.Y.2000) (quoting *Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 545 (3d Cir.1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote form the date of decision.")); *Ekwegbalu v. Central Parking System,* No. 97 Civ. 9477, 2000 WL 1371335, at *4 (S.D.N.Y. Sep. 22, 2000) (summary judgment granted in favor of defendant where plaintiff was unable to show connection between supervisor's racist statements and his termination). Accordingly, summary judgment is granted in Defendants' favor with respect to Plaintiff's discrimination claims relating to his termination.

### Retaliatory Discharge Claim

Plaintiff claims that he was wrongfully terminated in retaliation for filing an administrative charge with the New York State Department of Human Rights ("NYSDHR") alleging discrimination, on October 16, 2000. In the context of a motion for summary judgment, retaliation claims are analyzed using the burden shifting rules established in *McDonnell Douglas.* To make out a *prima facie* case of retaliation, a plaintiff must show that: (1) he or she was engaged in protected activity; (2) the employer was aware of the activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action taken by the employer. *Mack v. Otis Elevator Co.,* 326 F.3d 116, 129 (2d Cir.2003). If the plaintiff can make out a *prima facie* case, the burden shifts to the defendant "to articulate a 'legitimate, nondiscriminatory reason' for its actions." *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (citation omitted). If the defendant is successful, "the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered rea-

son merely a pretext for impermissible retaliation." *Richardson v. N.Y. State Dept. Corr. Serv.,* 180 F.3d 426, 444 (2d Cir.1999).

▪ Plaintiff has met his burden of establishing a *prima facie* case of retaliation. Termination is clearly a materially adverse change in the terms or conditions of employment sufficient to satisfy the third prong. In addition, filing a formal administrative charge alleging discrimination is sufficient to establish that Plaintiff engaged in a protected activity for the purposes of the first prong. *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). Plaintiff has satisfied the second prong by providing evidence to show that, on the afternoon of October 16, 2000, he informed Maryella Gockel, E & Y's Area Director of Human Resources, that he had filed a charge with the NYSDHR. As for the causal connection prong, a plaintiff can establish such a connection indirectly through a showing that the protected activity was followed closely in time by a discriminatory act. *Johnson,* 931 F.2d at 207 (citing *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987)). Here, Plaintiff has met the causal connection element by introducing evidence to show that he was terminated one day after he informed Defendant of his filing with the NYSDHR.

▪ Defendant has met its burden of proffering a legitimate, non-discriminatory rationale to explain Plaintiff's termination. Plaintiff has failed, however, to meet his burden of introducing evidence sufficient for a reasonable jury to find that Defendant's stated reasons were merely a pretext for retaliation. As previously explained, Plaintiff has failed to present evidence sufficient to support a finding that Defendant's stated reasons for Plaintiff's termination were false. Moreover, even if Plaintiff had introduced

evidence sufficient in this regard, Plaintiff has not met his burden of proffering facts to show that retaliatory animus was a motivating factor in Defendant's decision to terminate his employment. Defendant has introduced evidence sufficient to support a finding that the decision to terminate Plaintiff's employment was made prior to Plaintiff's filing his charge with the NYSDHR. Defendant has also introduced evidence to show that E & Y had allocated the funds to pay Plaintiff's severance package two weeks before Plaintiff filed his discrimination charge. Plaintiff has proffered no evidence to rebut these findings. Defendants' motion for summary judgment is, therefore, granted with respect to Plaintiff's claim of retaliatory discharge.

### Hostile Work Environment Claim

 Plaintiff has not offered any argument against dismissal of his hostile work environment claim. To resist a motion for summary judgment, a plaintiff making a hostile work environment claim must establish that the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citation omitted). Among the factors courts often consider in this regard are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. The Second Circuit has noted that isolated remarks and occasional incidents of harassment are generally insufficient establish a hostile work environment. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998). Plaintiff's evidence of a hostile work environment consists of only a few alleged, discriminatory comments made over a period of several years. Moreover, Plaintiff has offered no evidence that these comments unreasonably interfered with his work performance. Plaintiff has failed, therefore, to meet his burden of establishing that he was subjected to a hostile work environment. Accordingly, summary judgment is granted in Defendants' favor with respect to Plaintiff's hostile work environment claim.

### Negligent Hiring/Retention Claim

 Plaintiff has not argued against dismissal of his claim of negligent hiring/retention. Under New York law, in order to recover damages for injuries sustained due to an employer's negligence in hiring or retaining an employee, a plaintiff "must establish a duty owed by the defendant employer, a breach of that duty by the defendant employer, and damages proximately caused by the defendant employer's breach." *Perry v. Burger King Corp.*, 924 F.Supp. 548, 552 (S.D.N.Y.1996) (quoting *Vincenzino v. Calvosa*, 151 Misc.2d 95, 572 N.Y.S.2d 611, 612 (N.Y.Sup.Ct.1991)). Prior decisions in this district have noted that, in New York, negligent hiring/retention claims are usually sustained only where a plaintiff has suffered significant physical injury. *Id.* at 553 (citing *Brown v. Bronx Cross County Med. Group*, 834 F.Supp. 105, 109 (S.D.N.Y.1993)). Claims of negligent hiring/retention involving discriminatory harassment are generally not actionable. *Id.* Plaintiff has proffered no facts to demonstrate that he suffered any cognizable injury that Defendant had a duty to prevent, let alone the kind of "significant physical injury" usually required to state a claim of negligent/hiring and retention. Accordingly, summary judgment is granted in favor of Defendant with respect to

Plaintiff's claim of negligent hiring/retention.

*Claims Under 42 U.S.C. §§ 1983, 1985, 1986 and 1988*

Plaintiff has not contested dismissal of his claims under 42 U.S.C. §§ 1983, 1985, 1986, and 1988.

*Section 1983*

■ In order to bring a successful claim under Section 1983, a plaintiff must show that "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges." *Emblen v. Port Auth. of N.Y./N.J.,* No. 00 Civ. 8877, 2002 WL 498634, at *3 (S.D.N.Y. Mar.29, 2002) (quoting *Quinn v. Nassau County Police Dep't.,* 53 F.Supp.2d 347, 354 (E.D.N.Y.1999) (internal quotation marks omitted)). Plaintiff has neither alleged nor provided any evidence that E & Y acted under color of state law. Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's claim under Section 1983.

*Section 1985*

■ Defendant is entitled to judgment as a matter of law with respect to Plaintiff's claim under Section 1985. To prevail on a claim under Section 1985, Plaintiff must demonstrate that Defendant (1) engaged in a conspiracy (2) for the purpose of depriving a person or class of persons the equal protection of the laws or the equal privileges and immunities under the laws; (3) acted in furtherance of the conspiracy; and (4) deprived such person or class of persons the exercise of any right or privilege of a citizen of the United States. *N.Y. State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1358 (2d Cir.1989) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338

(1971)). Plaintiff has not alleged any facts in support of such a conspiracy. Further, Plaintiff's claim is barred by the "intracorporate conspiracy" doctrine, which provides that the agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together. *Salgado v. City of N.Y.,* No. 00 Civ. 3667, 2001 WL 290051, at *7, (S.D.N.Y. Mar 26, 2001) (citing *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978)).

*Section 1986*

■ Defendant is entitled to summary judgment with respect to Plaintiff's claim under Section 1986. A claim under Section 1986 is valid only if there is a viable conspiracy claim under Section 1985. *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). Since Plaintiff has failed to state a viable claim under Section 1985, he cannot establish a violation of Section 1986.

*Section 1988*

Section 1988 allows for the recovery of attorney's fees by the prevailing party in an action under, *inter alia,* Sections 1981, 1983, 1985 and 1986. 42 U.S.C.A. § 1988(b) (West 2003). Because Plaintiff has not prevailed on his claims under Sections 1983, 1985 and 1986, his request for fees with respect to those claims is denied.

*Attorneys' Fees*

■ Defendant has moved for costs and sanctions against Plaintiff and his attorneys pursuant to 28 U.S.C. § 1927 for their failure to withdraw baseless claims. Section 1927 provides that "an attorney or other person admitted to conduct cases ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C.A.

§ 1927 (West 1994). Section 1927 requires a showing of subjective bad faith. *Lapidus v. Vann*, 112 F.3d 91, 96 (2d Cir.1997). While a number of Plaintiff's claims are objectively baseless, specifically those under 42 U.S.C. §§ 1983, 1985, 1986, and 1988, Defendant has failed sufficiently to demonstrate that the failure to withdraw these claims was an act of bad faith. Further, Section 1927 cannot serve as a basis for sanctions against Plaintiff since it does not authorize the recovery of costs from a party, but only from an attorney or otherwise admitted representative of a party. *See Salovaara v. Eckert*, 222 F.3d 19, 35 (2d Cir.2000). Defendant's request for sanctions pursuant to 28 U.S.C. § 1927 is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted to the extent that the Complaint is hereby dismissed, and denied to the extent it seeks an award of costs and attorney's fees. Judgment shall be entered in Defendant's favor and the case shall be closed.

SO ORDERED.