Bruce JOHNSON, Plaintiff,

v.

STATE of CONNECTICUT, DE-
PARTMENT OF CORREC-
TIONS, Defendant.

No. CIV.A.303–CV–1129JCH.

United States District Court,
D. Connecticut.

Sept. 28, 2005.

George C. Springer, Jr., Butler, Norris & Gold, Hartford, CT, for Plaintiff.

Tammy D. Geathers, Attorney General's Office, Hartford, CT, for Defendant.

### RULING RE: DEFENDANT'S MO-TION FOR SUMMARY JUDG-MENT [DKT. NO. 18]

HALL, District Judge.

Plaintiff Bruce Johnson brings this employment discrimination action pursuant to 42 U.S.C. § 2000(e), *et seq.* ("Title VII"), and § 42 U.S.C. § 1981(a), against his former employer, the Department of Corrections of the State of Connecticut ("DOC"). The defendant moves for summary judgment, claiming that there is no issue of material fact concerning the circumstances of Johnson's termination and that it is entitled to judgment as a matter of law. For the reasons stated below, the defendant's motion is GRANTED in part and DENIED in part.

### I. FACTS [1]

Johnson is an African American Christian pastor. Johnson's claims arise out of several instances over his long employment with the Department of Corrections. He claims that he was not promoted due to his race and religion, and that he was subjected to retaliation and a hostile work environment.

Johnson has been employed by the Department of Corrections since 1987 and

---

1. For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving party, here the plaintiff, where there is evidence to support his allegations.

has served as a Correctional Counselor since 1990. Between 1987 and 1997, Johnson worked at the Cheshire Correctional Institution in Cheshire, CT. According to Johnson, at some point during his tenure at Cheshire, he applied for a promotion that went to a white male instead. In 1997, Johnson transferred to the Manson Youth Institution ("MYI") in Cheshire, CT. Johnson also claims that, upon his transfer to MYI, Karen Affricano, a white female who had been a provisional Correctional Counselor Supervisor, was given the position of permanent Correctional Counselor Supervisor despite Johnson being more qualified for the position. Johnson Affidavit, ¶¶ 24–28 [Dkt. No. 27–1].

*The 1999 Open Position.* In August 1999, the Department of Correction posted a opening for a Correctional Counselor Supervisor position open only to DOC employees for which Johnson was eligible. Johnson, along with 20 other DOC employees, applied for the position. The DOC hired Linda Prince, a white female, for the position based on her "education, experience, and excellent work record." Summary Judgment Motion, Ex. 7 [Dkt. No. 18–3]. In a memorandum concerning the hiring of Prince, a Personnel Director also described Prince as a "goal candidate," meaning she fulfilled their affirmative action goals, which were, at the time, to hire a white female, Hispanic female, or a black male. *Id.* In a "affirmative action flowchart" for the promotion, the reason listed for the decision not to hire Johnson was that he "did not respond as well as selected candidate." Summary Judgment Motion, Ex. 6. This is the reason listed for 12 of the 21 candidates that were not hired; of these 12, six were white males, three were white females, two were black males

(including Johnson), and one was a Hispanic female. *Id.*

Aside from the reference to Prince's education, experience, and excellent work record in the hiring memo, the DOC has not produced evidence of Prince's qualifications. Johnson contends that he was better qualified than Prince for the position as he had 14 years of experience working for the DOC while Prince had only four years of experience at the time. Johnson Affidavit, ¶¶ 33 and 34.

*The May 2000 Open Position.* In May 2000, the DOC posted a open position for a supervisor position in the Addiction Services Unit. Twenty people interviewed for the position. Johnson did not apply for the this supervisor position.

According to Johnson, in staff meetings on May 5, 2000 and June 2, 2000, Brett Rayford, the Director of Mental Health and Addiction Services, was critical of Johnson (and perhaps others) for running Christian-based 12–step programs at DOS. *Id.* at ¶ 36. Johnson recounted that Rayford, "plainly directing his animosity toward the plaintiff, stated that 'some of you need to leave your religion at home'" and threatened the staff with termination. *Id.*

In his affidavit, Johnson explains that he did not apply for this position due to "the hostile comments directed at my religious faith, the Rayford tirade, and my previous adverse experience in the promotional process." *Id.* at ¶ 40. The position was given to Kim Sharpe, a white woman.

*The July 2000 Open Position.* Two open supervisor positions were posted in July 2000.[2] Thirty one candidates, including Johnson, were considered for the position, and interviews were conducted by Deputy Warden Mary Morgan Wolff, Dep-

---

2. Johnson contends that the posting only gave notice that one position was open. Johnson

Deposition, p. 28.

uty Warden James Murdoch, and Personnel Officer Patricia Silva. The affirmative action goal at the time was black male. Six candidates were given a second interview; Johnson was not one of them. Augustus Pope, a black male, and Antonio Lopes, a white male, were selected for the open positions.

In her affidavit, Silva explained that the selection of the candidates was "based on their responses to the questionnaires and how they performed in the interviews with both the two deputy wardens and myself." Summary Judgment Motion, Ex. 2, Silva Affidavit, ¶ 14. Wolff explained in her affidavit that, in comparison to Johnson, Lopes "had a better attendance record and better performance evaluations and also had a higher degree (AS in Criminal Justice and BA in Sociology with a minor in Corrections) in a related field." Summary Judgment Motion, Ex. 4. Wolff Affidavit, ¶ 24. She also explained that Pope "also had a better attendance record and a higher degree (B.A. in criminology) in a related field." In a "Comparison Chart" related to the hiring, it is noted that Antonio Lopes had zero sick "occasions" from 8/03/99 to 8/3/00 and had received "excellents" overall in his 1999 and 1998 performance evaluations. Summary Judgment Motion, Ex. 18. The comments section for Lopes reads: "[h]as classification, custody, security and programming". Experience working in several different positions and facilities within DOC. *Id.* For Johnson, it notes that he had four sick occasions and had received "fully successful" in his 1999 and 1998 evaluations. His comments read: "T/A and Performance far less than selected candidate. No classification experience." *Id.* No information is provided on the chart for Augustus Pope.

Johnson contends that he was better qualified for the supervisor position than Lopes and Pope because he had more experience working with the MYI inmate population than either of them, and because Lopes had no experience in addiction services. Memorandum in Opposition, pp. 7–8 [Dkt. No. 27–1].

*September 2000 Open Position.* In September 2000 another supervisor position was posted. Johnson was scheduled to interview for the position on September 27, 2000, but requested that the interview be rescheduled because he was sick. The interview was rescheduled for October 2, 2000. Johnson was "unable to attend" the second interview because of a reaction to the medication that he was taking. Johnson Affidavit, ¶ 8. It is unclear from the evidence and Johnson's testimony at his deposition whether he had notified DOC ahead of time that he would not be able to attend the second interview. Johnson Deposition, pp. 32–33.

Upon returning to work, Johnson requested another opportunity to interview. According to Johnson, Patricia Silva told him that she would get back to him but then failed to do so. Johnson Affidavit, ¶ 56. Amonda Hannah, a black female, was recommended for the position.

*Evidence of Retaliation and Hostile Work Environment.* According to Johnson, on October 24, 2000, he had an informal "counseling session" with his supervisor, Kim Sharpe, for failing to complete group counseling sessions on time on several occasions. Johnson claims that MYI generally did not operate on schedule and that it was not a standard practice to have counseling in these circumstances. *Id.* at ¶ 60. Johnson received two letters in November 2000 charging him with taking an unauthorized leave between September 27, 2000 and October 2, 2000. *Id.* at ¶ 61.

On December, 27, 2000, Johnson filed a complaint alleging discrimination by the DOC with the Equal Employment Oppor-

tunity Commission (EEOC) and the Connecticut Commission on Human Rights and Opportunities (CHRO). Johnson claims that, after filing his complaint, he was subject to retaliation and a hostile working environment.

According to Johnson, after he filed his complaint, he was "routinely ridiculed by senior DOC staff, namely Kim Sharpe." *Id.* at ¶ 63. In April 2001, he received "no positive comments" in an audit of his treatment files. *Id.* at 67. In July 2001, Johnson received a written reprimand for an incident that occurred six months prior, in January 2001, in which Johnson escorted an inmate to an unassigned cell. Johnson claims that he had received the necessary permission for his actions and that the reprimand was issued in retaliation for his CHRO complaint. According to Johnson, this was the only formal reprimand that he received in his long tenure at DOC, and the reprimand served to preclude him from receiving promotions as long as it was in his file. *Id.* at ¶ 69. Johnson also claims that his conduct was common at MYI and not usually a basis for discipline. In August 2001, Johnson amended his CHRO complaint to include a charge of retaliation based on the reprimand.

In October 2001, after complaining that a new treatment program in which he was working was "inappropriate," Johnson was removed from the program and transferred to a new office with "inadequate equipment" and a different counseling program which required a "greater amount of work." *Id.* at ¶ 73–75.

On November 20, 2001, Johnson was "counseled" for late reporting of an absence. Johnson explains that he did not call because his mother was ill and he had to tend to her. He argues that "DOC employees have called in late and not all of them have received formal counseling." *Id.* at ¶ 76.

In March 2002, DOC did not respond to Johnson's complaint that personal property on his desk was destroyed. In April 2003, Johnson received counseling for incomplete treatment files that, he claims, were actually complete. *Id.* at ¶ 78. On July 8, 2003, Johnson received a tardiness notification that was later mitigated "after inordinate delay." *Id.* at ¶ 79. On September 30, 2003, Johnson received a letter of commendation from the warden for his response to a "code blue" in an inmate unit. Summary Judgment Motion, Ex. 29. On March 19, 2004, Johnson contends that he was "verbally assaulted" by a co-worker in response to a rotation request by Johnson that had been granted. Johnson Affidavit, ¶ 80.

*Procedural History.* Johnson received a right-to-sue letter from the EEOC on April 14, 2003, and subsequently filed suit against the DOC in Hartford Superior Court on June 16, 2003. Johnson's complaint alleges claims under 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981(a) for unlawful discrimination in the DOC's promotion practices, retaliation, "malicious violation of Title VII," and subjecting Johnson to a hostile work environment due to his race and religious convictions. Specifically, Johnson claims that the DOC promoted people who were less qualified than the plaintiff and engaged in a pattern of conduct which made it more difficult for the plaintiff to obtain promotions than others who applied for the same positions.

The DOC removed the suit to this court on June 26, 2003. In response to Johnson, the DOC argues that he has failed to make out a prima facie case for racial discrimination and that it has offered legitimate, nondiscriminatory reasons for denying Johnson the promotions, namely, that the people they hired were more qualified than Johnson. It also argues that Johnson's

retaliation and hostile work environment claims fail as a matter of law.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000). The moving party bears the burden of showing that no genuine factual dispute exists. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir.2000) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994)). When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "offer such proof as would allow a reasonable juror to return a verdict in his favor." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). "Only when that proof is slight is summary judgment appropriate." *Id.* A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a Summary Judgment Motion." *Lipton v. The Nature Company*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the Summary Judgment Motion are not credible).

### B. Disparate Treatment [3]

■ In failure-to-promote cases brought under Title VII, courts follow the now-familiar, burden-shifting Title VII analysis first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court "set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. The initial burden in a disparate treatment claim brought under the Title VII is on the plaintiff to establish a *prima facie* case of discrimination. To do so, the plaintiff must show (1) that he was in the protected group, (2) that the plaintiff applied for a position for which he was qualified, (3) that the plaintiff was subject to an adverse employment decision, and (4) that the decision occurred under circumstances giving rise to an inference of discrimination. See e.g., *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101

---

**3.** This court is not aware of any tort or statutory remedy for the "malicious violation" of Title VII, and the plaintiff has not alerted this court to any authority establishing this type of claim.

(2d Cir.2001). To establish the fourth prong, a plaintiff "may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2000).

 Once a plaintiff has established a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once a defendant offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to fulfill his ultimate burden of proving that the defendant intentionally discriminated against him in the employment decision. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. *Id.* Evidence that an employer's reason is false, combined with the evidence presented to establish a prima facie case, in some cases can be sufficient to sustain a plaintiff's burden, and a plaintiff need not have further evidence of discrimination. *Id.; see also Zimmermann v. Assoc. First Capital Corp.*, 251 F.3d 376, 381–82 (2d Cir.2001). Ultimately, a finder of fact may consider the strength of the prima facie case, the probative value of the proof that the defendant's reason is pretextual, and any other evidence presented in the case when determining if the plaintiff has sustained her burden. *Zimmermann*, 251 F.3d at 381–82.

 However, even courts mindful of the fact that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated" have nonetheless granted summary judgment at the pretext stage where the plaintiff has "provided no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext." *See Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir.1985); *see also Dister*, 859 F.2d 1108; *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir.1998)(reversing jury verdict in ADEA case because "Norton's very weak *prima facie* case, combined with an at best highly dubious showing of pretext, that in itself does not implicate discrimination, is simply not enough to support the jury's conclusion that he was fired because of his age.") Summary judgment was appropriate where the "plaintiff presented no evidence upon which a reasonable trier of fact could base the conclusion that [discriminatory animus] was a determinative factor in defendants' decision to fire him." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir.2000).

## C. Retaliation

 Retaliation claims under Title VII are treated under the same *McDonnell Douglas* framework as discrimination claims. To establish a *prima facie* case of retaliation, a plaintiff must show (1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision. *See e.g., Richardson v. New York State Dept. of Corr. Serv.*, 180 F.3d 426, 443 (2d Cir.1999). An adverse employment actions is a "materially adverse change in the terms and conditions of employment." *Id.* at 445 (quotation omitted). While Title VII "does not define adverse employment action solely in terms

of job termination or reduced wages and benefits ... not every unpleasant matter short of discharge or demotion creates a cause of action." *Id.* (quotation omitted).

## D. Hostile Work Environment

█ To establish a "hostile work environment" claim, a plaintiff must show that "(1) the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Id.* at 436 (citing *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997)). Factors relevant to determining whether a given workplace is permeated with severe or pervasive discrimination are: "(1) the frequency of the discriminatory conduct; (2) its severity, (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance'; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Id.* at 437 (citing *Harris v. Forklift Systems,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

## IV. DISCUSSION

### A. Sovereign Immunity

The DOC argues that Johnson's section 1981 claims are barred by the sovereign immunity afforded Connecticut under the Eleventh Amendment. However, under the rationale of the Supreme Court in *Lapides v. Bd. of Regents of Univ. Sys. of Georgia,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002), the voluntary removal of the case by the state attorney general to federal court acts as a waiver of sovereign immunity. In *Lapides,* the Court held that "where a state voluntarily become[s] a party to a cause, and submits its rights for judicial determination, it will be bound thereby, and cannot escape the result of its own voluntary act by invoking the prohibitions of the [Eleventh] Amendment." 535 U.S. at 620, 122 S.Ct. 1640.

█ While the Court in *Lapides* explicitly limited its holding to cases involving the removal of state law claims to federal court, this reasoning clearly extends to the removal of federal claims as well. Accordingly, several circuits have extended *Lapides* to hold that removal to federal court by a state actor acts as a waiver of sovereign immunity for federal claims. *See Meyers v. Texas,* 410 F.3d 236, 242 (5th Cir.2005); *Embury v. King,* 361 F.3d 562, 564–65 (9th Cir.2004). While the Second Circuit has not addressed the issue specifically, it has broadly cited *Lapides* for the proposition that "[a] state is deemed to have invoked the court's jurisdiction when it has made a voluntary appearance in federal court." *In re: Charter Oakes Associates,* 361 F.3d 760, 767 (2d Cir.2004)(quotation omitted). Thus, under the rationale of *Lapides,* the act of removal by the DOC to federal court waived any defense that they could raise under the Eleventh Amendment.

█ Nonetheless, although the defendant did not raise this issue, Johnson's section 1981 claim against the DOC would appear to fail. Claims under section 1981 against state actors must be brought under 42 U.S.C. § 1983. *See Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004)("[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units ....")(quoting *Jett v. Dallas Independent School District,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). Johnson's section 1981 claim was not pled under section 1983. However, even if Johnson were to

have brought his section 1981 claim under section 1983, it would necessarily fail as states are not considered "persons" under section 1983, regardless of whether a particular state has waived its sovereign immunity. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that states, and state entities that receive Eleventh Amendment immunity, are not "persons" under section 1983.). Given that the government did not raise this issue in its motion for summary judgment, the plaintiff is granted under October 26, 2005 to show cause why the section 1981 claim should not be dismissed.[4]

## B. Failure–To–Promote Claims

■■■ The plaintiff has characterized his claim as being based on the "pattern" of the DOC's conduct in its failure to promote him. However, failure-to-promote claims are paradigmatic "discrete acts" that are typically considered individually. See *Forsyth v. Fed. Employment and Guidance Serv.,* 409 F.3d 565, 572 (2d Cir.2005) ("For most discrete discriminatory acts, i.e., termination, failure to promote, denial of transfer, or refusal to hire ...."). While mindful of the Second Circuit's exhortation to consider the totality of the facts in determining whether summary

judgment is appropriate, *see Howley v. Town of Stratford,* 217 F.3d 141, 151 (2d Cir.2000), for the sake of clarity in analysis, the court first considers each of the non-promotions in turn to determine whether any present a triable issue of fact that precludes summary judgment.

### 1. *Pre–1999 Promotions* [5]

According to Johnson, sometime between 1987 and 1997, while he was working at the Cheshire Correctional Institution, he applied for a promotion that ultimately was given to a white male with less experience from Johnson. Johnson also alleges that in 1997 he applied for a promotion that was given to a white woman with less experience than Johnson. The DOC has not addressed either of these claims in its motion for summary judgment or Rule 56(a) Statement, and, therefore, the court finds that the DOC has not moved for summary judgment on these claims. The court grants the defendant until October 26, 2005, to move for summary judgment on these claims.

### 2. *1999 Promotion* [6]

■■■ In 1999, Johnson interviewed for a promotion that was eventually given to

---

4. Given this analysis, the court does not consider the plaintiff's section 1981 claim in this opinion. If the plaintiff successfully shows that dismissal of this claim is not appropriate, the court will revisit this cause of action.

5. Under Title VII, a plaintiff has 180 days from the date of an alleged unlawful employment practice to file a complaint with the EEOC, or 300 days from the date of the alleged unlawful act, to file a complaint with the appropriate state agency. See 42 U.S.C. § 2000e–5; *National RR Passenger Corp. v. Morgan,* 536 U.S. 101, 109–10, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)("[A] litigant has up to 180 or 300 days *after* the unlawful practice happened to file a charge with the EEOC")(emphasis in original); *Forsyth v.*

*Fed. Employment and Guidance Serv.,* 409 F.3d 565, 572 (2d Cir.2005). While it would appear that a statute of limitations defense is available to the defendant, it has not raised the defense in its summary judgment motion.

6. In his opposition to the defendant's Summary Judgment Motion, the plaintiff has explicitly chosen not to discuss the 1999 promotion or his theory of religious discrimination because, he argues, the defendant does not specifically address these issues in its motion. Pl. Opp. to Summary Judgment, p. 2. The court agrees that the defendant has not addressed the plaintiff's claim of religious discrimination in its motion. The court therefore grants the defendant until October 26, 2005, to move for

Linda Prince, a white female. The DOC claims that Johnson "did not interview well" for the position, and Prince was chosen because of her "education, experience, and excellent work record." Johnson argues that this proffered reason must be pretextual because he was, in fact, more qualified for the position than Prince.

Johnson has clearly established the first three prongs of his *prima facie* case. As an African–American, he is a member of a protected class, he was qualified for the position having been on the list of employees eligible for promotion, and he was not promoted. It is less clear, however, that he has established the fourth prong, i.e., that he has demonstrated circumstances giving rise to an inference of discrimination.

■■ While "there is nothing unlawful about an employer's basing its hiring decisions on subjective criteria, such as the impression an individual makes during an interview ... an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104 (2d Cir.2001). "While we do not second-guess an employer's hiring standards, the reasons for its employment decision, including its reliance on nondiscriminatory standards, are subject to scrutiny under Title VII." *Howley*, 217 F.3d at 150. The reason proffered for not choosing Johnson that he did not "interview well"-standing alone, could itself warrant further investigation by a fact finder and a denial of summary judgment. However, where, as here, the same reason is not offered just for Johnson, but for many applicants not in

Johnson's protected class, this court cannot conclude that the circumstances of Johnson's non-promotion give rise to an inference of discrimination. *See e.g., Howley*, 217 F.3d at 152 (noting that, where male candidate was chosen over female plaintiff and two other males, "we have difficulty envisioning ... a reasonable inference that [the male candidate] was chosen because he was a man."); *Monte v. Ernst & Young, LLP*, 330 F.Supp.2d 350, 361 (S.D.N.Y.2004) (finding that fourth prong was not met where Puerto Rican plaintiff was denied a promotion when four Caucasians were also denied a promotion at the same time).

Additionally, Johnson cannot establish his claim by arguing that he was clearly more qualified than Prince, thus either demonstrating an inference of discrimination, or, alternatively, that the employer's proffered reasons are pretextual. According to the Second Circuit:

> [w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to make unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person could have chosen the candidate selected over the plaintiff for the job in question.

*Byrnie*, 243 F.3d at 103. Johnson contends that he was clearly more qualified for the position due to the fact that he had

---

summary judgment on this claim. However, the defendant has clearly moved for summary judgment on all counts, and has proffered evidence concerning the 1999 promotion. Accordingly, the court will

evaluate the sufficiency of the plaintiff's claim concerning this promotion based on the evidence and pleadings before it. Memorandum in Support of Summary Judgment Motion, p. 2.

worked at the DOC for fourteen years as compared to Prince's four years. Given that seniority is not listed as a paramount qualification for the position in the DOC's job description, this court cannot conclude, on the basis of the evidence before it, that "no reasonable person" could have chosen Prince over Johnson for the supervisor position. *See* Summary Judgment Motion, Ex. 27. Thus, Johnson's discrimination claim as to the 1999 promotion fails as a matter of law.

### 3. *May 2000 Promotion*

■ In May 2000, the DOC posted a supervisor position that was eventually filled by Kim Sharpe, a white woman. Johnson chose not to apply for the position because of "hostile comments" that had been made regarding a Christian-based twelve-step program that Johnson had implemented, which Johnson understood as hostile comments directed at his religious beliefs themselves. Johnson's failure to apply for the position precludes his ability to state a *prima facie* case of employment discrimination under *McDonnell Douglas*. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998)("We read *McDonnell Douglas* and *Burdine* generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom . . . ."). Thus no discrimination claim can be stated on the basis of the May 2000 non-promotion.

### 4. *July 2000 Promotions*

In July 2000, the DOC posted two more open supervisor positions for which Johnson applied. The positions were given to Augustus Pope, a black male, and Antonio Lopes, a white male.

■ Given that both Pope and Johnson are black males, Johnson cannot make out a prima facie case of race discrimination on the basis of Pope's promotion over John-son as the circumstances do not give rise to an inference of discrimination. *See e.g., Brennan v. City of White Plains,* 67 F.Supp.2d 362, 373 (finding claim of gender discrimination by female plaintiff insufficient where open positions were ultimately filled by women); *Samuels v. New York State Dept. of Cor. Serv.,* 94–CIV–8645, 1997 WL 253209, at *6 (S.D.N.Y. May 14, 1997)(finding no inference of race discrimination where two of four open positions when to black males).

■ Pope's promotion suggests that discrimination was not present when the DOC promoted Lopes over Johnson as well. *See Samuels,* 1997 WL 253209 at *6. Even if this weren't the case, Johnson has failed to show that he was clearly more qualified than Lopes such that the DOC's choice of Lopes on the basis of his qualifications was clearly pretextual. *See Byrnie,* 243 F.3d at 103. As the documentary evidence indicates, Lopes had received consistently excellent evaluations, had a better attendance record than Johnson, and had previous relevant experience that Johnson had not had. Thus, under the standard of *Byrnie,* a fact finder could not find that no reasonable person would have promoted Lopes over Johnson.

### 5. *September 2000 Promotion*

In September 2000, another supervisor position opened up and Johnson applied for it. He was forced to miss two scheduled interviews due to illness, however, and the DOC did not schedule another interview for him upon his request. The position was filled by Amonda Hannah, a black female.

As in the case of the Pope promotion, the fact that Hannah was also black precludes the inference that the DOC discriminated against Johnson because of his race. Whatever unfairness may have accrued to Johnson in the promotion process due to

his inability to schedule a third interview, this court cannot conclude that the DOC's unwillingness to grant a third interview was due to Johnson's race, or that Johnson has shown that there is a triable issue of fact in regard to the DOC's motives.

### 6. *Promotions Pattern as a Whole*

As noted above, this court is mindful that it is required to consider the evidence before it as a whole in determining whether the plaintiff has alleged a triable set of facts in a discrimination case. While it is helpful to consider each promotion in turn, the court is mindful that discrimination claims are often premised on circumstantial evidence that has weight when considered together. Here, however, in considering the plaintiff's claim as a whole, the court does not find any evidence on which a fact finder can conclude that the plaintiff was discriminated on account of his race in his failure to obtain a promotion at the DOC. That Johnson has been unable to secure a promotion despite his long tenure at DOC is not itself evidence of discrimination, and that many instances of non-promotion occurred do not give rise to an inference of discrimination. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 458 (2d Cir.1999)("As many of the pieces of evidence do not allow for the reasonable inference of discrimination, they assume in this case no super-inferential powers when viewed together."). Johnson has not presented evidence from which a rational fact finder can conclude that race was a determinative factor in the DOC's failure to promote him. *See Schnabel,* 232 F.3d 83. Thus Johnson has failed to state a claim for disparate treatment on the basis of race discrimination under Title VII.

### C. Retaliation

Johnson claims that after he filed his complaints with the CHRO and the EEOC in December 2000, that he was subject to retaliation by his employer. His retaliation claim is largely based on a written reprimand that he received in July 2001 for an incident that occurred in transporting an inmate in January 2001, although he also includes in his retaliation claim other incidents: he claims that he was "routinely ridiculed" by a supervisor, received no positive comments in an audit of his files, and, in October 2001, and was transferred to a different office and a "more volatile" unit after he complained that the treatment program in which he was working was "inappropriate" for the inmate population. Memorandum in Opposition, pp. 17–18. His request for a transfer from the more volatile unit was not honored for at least two years. In addition, Johnson claims that received other disciplinary measures based on false premises in 2002 and 2003, and was "verbally assaulted" by a co-worker in 2004.

 Most of Johnson's retaliation claim is insufficient as a matter of law because the incidents of which he complains do not rise to the level of "adverse employment action" under the relevant standard:

> An adverse employment action is a materially adverse change in the terms and conditions of employment .... To be "materially adverse," a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities ... Such a change "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation".

*Weeks v. New York State (Div. of Parole),* 273 F.3d 76, 85 (2d Cir.2001), abrogated on other grounds by *Nat'l R.R. Passenger*

*Corp. v. Morgan,* 536 U.S. 101, 108–114, 122 S.Ct. 2061, 153 L.Ed.2d 106(2002)(quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)).

In *Weeks,* the plaintiff claimed that receiving a "notice of discipline" was itself an adverse employment action. *Id.* at 86. The Second Circuit held that, where the plaintiff did not show that the notice "created a materially adverse change in her working conditions" that it could not be the basis for a retaliation claim. *Id.* at 86. Under *Weeks,* the informal counseling that Johnson received for tardiness and incomplete treatment files do not rise to the level of adverse employment action as they did not result in a material change to his working conditions. In addition, the lack of positive comments in his evaluation is not an adverse employment action, *see Lanier v. I.B.M. Corporation,* 319 F.Supp.2d 374, 384–85 (S.D.N.Y.2004), nor is the relocation of his office, *see Sioson v. Knights of Columbus,* 160 F.Supp.2d 316, 322 (D.Conn.2001)(Hall, J.)(holding relocation of desk is not adverse employment action). The "routine ridicule" that Johnson allegedly suffered also does not, without more, rise to the level of an adverse employment action for retaliation claims. *See Brennan v. City of White Plains,* 67 F.Supp.2d 362, 374 (S.D.N.Y.1999)("While verbal abuse might at times be sufficiently severe and chronic to constitute an adverse employment action, such behavior, without more, hardly rises to the level of actionable retaliation.").

More serious, however, is the written reprimand that he received in July 2001. According to Johnson, this reprimand precluded him from receiving promotions for the two years that it was in his file. It is not clear whether the reprimanded acted formally or informally to preclude Johnson from promotion. If the reprimand did act to prevent Johnson from being promoted, it may constitute an adverse employment action. *See, e.g., Knight v. City of New York,* 303 F.Supp.2d 485, 497 (S.D.N.Y. 2004) ("Disciplinary memoranda and evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotions, wages or termination."). Furthermore, Johnson's transfer to a more volatile unit could also constitute an adverse employment action. *See Terry v. Ashcroft,* 336 F.3d 128, 144 (2d Cir.2003)("An internal transfer can be an adverse employment action if accompanied by a negative change in the terms and conditions of employment.").

Even if these were adverse employment actions, Johnson, to make out a *prima facie* case of retaliation, must establish that the actions were causally linked to Johnson's protected activity, i.e., the filing of his CHRO complaint. "Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct ... or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.1987). Johnson has not presented any specific evidence of retaliatory animus directed against him. The events of which he complains in 2001, 2002, 2003, and 2004, including the written reprimand and the transfer, are too attenuated temporally from the filing of Johnson's complaint to support an inference of causation. While the Second Circuit has not established a bright line rule for determining whether retaliatory conduct "followed closely" a plaintiff's protected activity, *see Gorman–Bakos v. Cornell Cooperative Extension of Schenectady Coun-*

*ty,* 252 F.3d 545, 554 (2d Cir.2001), courts in the Second Circuit have rejected finding a causal inference when there were gaps of three months, six months, eight months, one year, and eleven months between the filing of the complaint and the alleged retaliation. *White v. Whitman,* 99–CIV–4777, 2002 WL 776589, at *12 (S.D.N.Y. April 26, 2002)(citing cases).

Johnson's written reprimand for the January 2001 inmate incident occurred in July 2001, seven months after he filed his complaint with the CHRO. Johnson's transfer to the more volatile unit occurred in October 2001–ten months after he filed his complaint with the CHRO. Thus, without some more evidence of retaliatory animus, Johnson cannot establish the causal element of his prima facie retaliation case as to the written reprimand or transfer. Furthermore, the events subsequent to the transfer, even if they were to constitute adverse employment actions (which is unlikely), cannot be causally linked to the filing of Johnson's complaint. Thus, Johnson has failed to produce evidence that could support a claim for retaliation.

## D. Hostile Work Environment

To establish a hostile work environment claim, a plaintiff must prove that "the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Delrio v. Univ. of Connecticut Health Care,* 292 F.Supp.2d 412 (D.Conn.2003)(quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The incidents of the discriminatory conduct "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Faragher*

*v. City of Boca Raton,* 524 U.S. 775, 787 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

The plaintiff argues that all of his allegations considered together establish his hostile work environment claim. This blanket assertion is not persuasive. The non-promotions at the heart of Johnson's complaint do not establish a hostile workplace as they have not been found to be discriminatory in nature. The claims of retaliation are not sufficiently severe or pervasive as to "alter the conditions of the victim's employment;" furthermore, the comments about Johnson's religious activities in 2000 and the "verbal abuse" Johnson experienced from a co-worker in 2004 cannot be considered continuous and concerted. The most serious allegation that could give rise to this claim is Johnson's contention that he has suffered constant ridicule by his supervisors since he filed his complaint in December 2000. However, Johnson has not provided any specific examples of ridicule or insult, and thus the mere allegation of this conduct alone cannot save Johnson's claim on summary judgment. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995)(noting that summary judgment "will not be defeated merely ... on the basis of conjecture or surmise."). Accordingly, Johnson has failed to establish a claim for hostile work environment as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, the defendant's Summary Judgment Motion [Dkt. No. 18] is GRANTED in part and DENIED as to Johnson's pre–1999 claims and religious discrimination claims. The defendant is granted until October 26, 2005 to move for summary judgment on the remaining claims, and the plaintiff is granted until October 26, 2005 to show

cause why his 42 U.S.C. § 1981 claim should not be dismissed.

**SO ORDERED.**